2016 IL App (1st) 133741

FOURTH DIVISION
March 10, 2016

No. 1-13-3741

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 09 CR 12710 |
| | ) | |
| IELIOT JACKSON, | ) | Honorable |
| | ) | Maura Slattery-Boyle |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE ELLIS delivered the judgment of the court, with opinion.
Presiding Justice McBride and Justice Cobbs concurred in the judgment and opinion.

**OPINION**

¶ 1     Following a jury trial, defendant Ieliot Jackson was convicted of delivery of less than one gram of a controlled substance (heroin) within 1,000 feet of a school. 720 ILCS 570/407(b)(2) (West 2008). He was sentenced to 13 years in prison.

¶ 2     In defendant's first appeal, we vacated his sentence and remanded for new posttrial proceedings based on the trial court's failure to properly admonish defendant under Illinois Supreme Court Rule 401(a) (eff. July 1, 1984). *People v. Jackson*, 2013 IL App (1st) 112269-U. On remand, the circuit court again denied defendant's posttrial claim of ineffective assistance of counsel and motion for a new trial. The court again sentenced defendant to 13 years in prison. The trial court also held defendant in contempt for walking out of the courtroom while being

admonished on his right to appeal and added an additional six months to defendant's 13-year sentence.

¶ 3     Defendant raises several arguments in support of a second remand. Defendant initially argues that we must reverse his conviction and remand for a new trial because the trial court's failure to comply with Illinois Supreme Court Rule 431(b) (eff. May 1, 2007) was plain error, and the evidence at trial was closely balanced. Defendant alternatively argues, and the State agrees, that we must remand this case for a proper preliminary inquiry into his claims of ineffectiveness of counsel under *People v. Krankel*, 102 Ill. 2d 181 (1984). Defendant additionally argues, and the State again agrees, that we should remand this case for further proceedings to determine whether defendant should be permitted to proceed *pro se* for posttrial motions and sentencing. Finally, defendant contends that the case should be remanded to a different trial judge.

¶ 4     We agree with defendant that the trial court's Rule 431(b) admonishments were improper, but we hold that they did not constitute plain error because the evidence at trial was not closely balanced. We hold that the trial court did not conduct an adequate evaluation of defendant's claim of ineffective assistance of counsel in the preliminary *Krankel* hearing. We further hold that the trial court improperly denied defendant his right to proceed *pro se* at the posttrial proceedings that followed the *Krankel* hearing. We thus affirm defendant's conviction, vacate the trial court's rulings at the *Krankel* hearing and on the motion for new trial, and vacate defendant's sentence. We remand this cause to a different trial judge for consideration of these posttrial matters.

¶ 5                                    I. BACKGROUND

¶ 6    Defendant was charged by indictment with delivery of a controlled substance and delivery of a controlled substance within 1,000 feet of a school. He exercised his right to a jury trial. The trial court admonished the jury pursuant to Illinois Supreme Court Rule 431(b) (eff. May 1, 2007), which we discuss in further detail below as part of our analysis of defendant's arguments. We first review the evidence presented at trial and the details of jury deliberations, as discussed in our prior order.

¶ 7                              A. Evidence at Trial

¶ 8    The State presented four witnesses at trial: Chicago police officer Clark Eichman, an undercover narcotics officer; Chicago police officer Charlie Person, a surveillance officer; Mary Ember, an investigator; and Lenetta Watson, a forensic scientist.

¶ 9    Officer Eichman testified that he first met the defendant on May 30, 2009, on the 4800 block of West Superior in Chicago. He identified defendant in court. Officer Eichman was parked on the north side of the street in the middle of the block in a covert vehicle. Defendant was on a BMX bicycle. The encounter lasted no more than a minute. Defendant asked Officer Eichman for his telephone number and his name. Officer Eichman gave defendant his number and told him that his name was "Ike." Defendant entered the information into a cell phone. Officer Eichman then drove away.

¶ 10   Officer Eichman drove westbound on West Superior and then made a left-hand turn southbound on Lamon, at which point his cell phone rang. Officer Eichman did not recognize the telephone number but recognized defendant's voice when he answered. Defendant told Officer Eichman to call him if he needed anything, which Officer Eichman understood to mean narcotics. Officer Eichman saved the number to his cell phone and labeled it "BMX," so he would remember it was the number belonging to the person on the BMX bicycle. Officer

Eichman did not create any written documentation of this interaction. He told some of his team members, none of whom documented it. Officer Eichman testified that an officer, either Officer Williams or Officer Calvo, created a contact card for defendant that day.

¶ 11     Two weeks later, on June 13, 2009, at approximately 9 a.m., Officer Eichman was with a team of surveillance officers and undercover officers to make a controlled purchase of narcotics. Officer Eichman's role was the undercover purchasing officer. Also present was his supervisor, Sergeant Santos, who was going to be a surveillance officer, as well as Officer Person, the primary surveillance officer, and Officer Fleming, the secondary surveillance officer. There were also two enforcement officers present, Officer Williams and Officer Calvo.

¶ 12     At 9:19 a.m., Officer Eichman received a call on his cell phone from "BMX." When he answered, a male voice said, "Ike, you good." Officer Eichman responded no and told the caller that he needed to get "hooked up," which he testified was a street term meaning he wanted to purchase narcotics. The caller told Officer Eichman to go to the area of 4800 West Superior. Officer Eichman told the caller he was 30 minutes away. After finishing the phone call, Officer Eichman told his team members, who were all with him at the time, that he had just received a call from BMX, so that they could go set up the block where they believed the purchase would take place. Once set up, the surveillance team contacted Officer Eichman, who then called BMX at 9:39 a.m. Officer Eichman testified that the person who answered the telephone had the same voice as the person to whom he had spoken 10 minutes earlier. Officer Eichman told him that he was 5 minutes away, and the caller asked how many "blows" he needed. Officer Eichman explained at trial that "blow" is a street term for heroin. Officer Eichman told the caller that he needed four "blows."

¶ 13    Officer Eichman drove to the area of 4800 West Superior in an unmarked vehicle. He was alone in his vehicle and had turned off his police radio before he arrived. He parked on the north side of the street at 4856 West Superior, approximately one block away from Nash Grammar School. He saw Officer Person parked approximately two houses or 50 feet away, on the south side of the block. At 9:46 a.m., Officer Eichman called back the BMX telephone number. The person who answered had the same voice as the individual with whom Officer Eichman had spoken earlier. When Officer Eichman told him that he was on the block, the person said "is that you at the end of the block." Officer Eichman said yes, hung up, and began looking for the person using his side and rearview mirrors. Officer Eichman testified that he then saw defendant walking toward his vehicle and, as he got closer, recognized him as the individual whom he had met on May 30 and whom he had called "BMX." He recognized defendant's distinctive beard.

¶ 14    Officer Eichman testified that he spoke to defendant through his open window and defendant gave him four small Ziploc bags with blue tint on one side and an "S" logo, each of which contained white powder. Officer Eichman gave defendant $40 of prerecorded funds, which defendant placed in his pocket, and Officer Eichman drove away. He then contacted his team members via the police radio that a narcotics transaction had taken place and gave a physical description of defendant, including his clothing and last known location. Officer Eichman then returned to the police station at Homan Square.

¶ 15    Once at the Homan Square station, Officer Eichman identified defendant from a photo array. He also inventoried the items he had purchased. Officer Eichman testified that he learned that defendant had been arrested 11 days later, on June 24, 2010, on the 4800 block of West Superior.

¶ 16    Officer Charlie Person testified that he did undercover narcotic surveillances. On June 13, 2009, he was the primary surveillance officer on the narcotics team with Officer Eichman. Officer Person testified that he was parked in an undercover vehicle at 4849 West Superior approximately 30 feet from Officer Eichman, on the opposite side of the street. Officer Person saw defendant walk down the street approximately four or five minutes after Officer Eichman arrived. Officer Person made an in-court identification of defendant. Officer Person testified that defendant passed by the passenger side of Officer Person's vehicle, giving him a side view of defendant. Officer Person testified that he saw defendant walk to Officer Eichman's driver side window and have a conversation. He then saw defendant tender items to Officer Eichman in exchange for money. Officer Person stated that he could not hear the conversation nor could he see what the items were. He did not use any audio or video devices to record the transaction, nor did he take any photographs. Following the transaction, he saw Officer Eichman drive away. Officer Eichman then came into radio contact with the narcotics team, and Officer Person proceeded to the Homan Square station.

¶ 17    Illinois State Police Forensic Specialist Lenetta Watson testified that the contents of one of the bags tested positive for heroin. Cook County State's Attorney's Office Investigator Mary Ember testified that Nash Grammar School, located at 4837 West Erie, was an active school in good standing. She measured the distance between 4856 West Superior Street and Nash Grammar School to be 732 feet. At trial, defendant did not present any evidence.

¶ 18                                      B. Jury Deliberations

¶ 19    The jury began deliberating at 2:47 p.m. At 4:10 p.m., the jury sent a note and asked the following questions:

        (1) "Why was the phone not admitted as evidence?"

(2) "Why did I Eichman [*sic*] park where he did?"

(3) "Why didn't Person take any pictures of the transaction?"

The court responded: "You have heard all the evidence. You have the exhibits and the instructions. Continue to deliberate." The trial judge signed this order at 4:24 p.m. and tendered it to the jurors.

¶ 20    At 4:45 p.m., the jury sent another note and asked:

"We are locked 11 to 1, what happens next?"

The trial judge replied: "Continue to deliberate. Your verdict must be unanimous. Judge Boyle. 4:51 p.m."

¶ 21    Shortly after 5 p.m., the jury reached a verdict. It found defendant guilty of delivery of a controlled substance within 1,000 feet of a real property comprising a school.

¶ 22                                 C. Posttrial Proceedings

¶ 23    At a posttrial hearing, defense counsel told the court that she had filed a posttrial motion and was ready to proceed on her argument for a new trial, but that defendant wished to proceed *pro se* at that point. After receiving some admonishments regarding his waiver of counsel, the trial court allowed defendant to proceed *pro se* and granted defendant an extension of time to prepare his *pro se* motion. After granting defendant several continuances, defendant appeared *pro se* and argued his motion for a new trial and his "motion for ineffective assistance of counsel." Both were denied. The trial court sentenced defendant to 13 years in prison and denied his *pro se* motion to reconsider his sentence.

¶ 24                                 D. First Appeal

¶ 25    Defendant appealed, raising two issues: (1) his conviction should be reversed because the trial court failed to comply with Illinois Supreme Court Rule 431(b) (eff. May 1, 2007); and (2)

the trial court failed to substantially comply with Illinois Supreme Court Rule 401(a) (eff. July 1, 1984) before permitting him to proceed *pro se* on his posttrial motions. *Jackson*, 2013 IL App (1st) 112269-U ¶ 31. We concluded that the second argument was meritorious. We further noted that the State had also acknowledged that the trial court's admonishments did not adequately comply with Rule 401(a), and that the matter should be remanded. We vacated defendant's sentence and remanded the case "for proper admonitions to defendant under Rule 401(a), for posttrial motions." *Id.* ¶ 32. We did *not* address defendant's first argument and expressly stated that "[i]n view of our decision, it would be premature to address defendant's argument that \*\*\* the trial court failed to comply with Illinois Supreme Court Rule 431(b)." *Id.*

¶ 26                                      E. Remand

¶ 27     On remand, defendant requested counsel. The court appointed Assistant Public Defender Benesh, who had been cocounsel during defendant's trial. Mr. Benesh informed the court that defendant wished to present his claim for ineffective assistance of counsel as to both Mr. Benesh and Assistant Public Defender Roos, who had been lead counsel during defendant's trial.

¶ 28     The trial court conducted a preliminary *Krankel* hearing. We will consider that hearing at length later, but it suffices for now that the trial court found that defendant failed to demonstrate that his trial counsel provided ineffective assistance. After the trial court rejected his *pro se* claims at the preliminary *Krankel* inquiry, defendant told the court he wished to proceed *pro se* on any further posttrial proceedings—namely, his motion for a new trial and sentencing. The trial court found that defendant did not understand the ramifications of representing himself and denied his request to proceed *pro se*.

¶ 29     Defense counsel asked that the issues raised by defendant during the preliminary *Krankel* inquiry be incorporated into defendant's motion for a new trial. After hearing argument from

both parties on the motion for a new trial, the trial court denied the motion. At resentencing, the court again sentenced defendant to 13 years in prison.

¶ 30    While the court was advising defendant of his right to appeal, defendant commented that the judge was not being fair to him. As defendant notes, he and the trial judge engaged in a "back and forth." Defendant apparently turned his back on the judge and told her he was not listening to her. The trial court held defendant in direct contempt and imposed an additional prison term of six months, consecutive to his 13-year sentence.

¶ 31    Defense counsel filed a motion to reconsider sentence, which the trial court denied. This appeal followed.

¶ 32                              II. ANALYSIS

¶ 33                         A. Rule 431(b) Admonishments

¶ 34    Defendant first argues that his conviction should be reversed and this matter remanded for a new trial because the trial court failed to comply with Illinois Supreme Court Rule 431(b) (eff. May 1, 2007). To preserve an issue for appeal, a defendant must raise an objection in the trial court and raise the issue in a posttrial motion. *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Defense counsel did not object to the trial court's purported noncompliance with Rule 431(b). Conceding he forfeited the issue, defendant claims that the evidence was closely balanced and the trial court's error was reversible error under the plain-error doctrine.

¶ 35    We may review an unpreserved error under the plain-error doctrine found in Illinois Supreme Court Rule 615(a), which provides a limited and narrow exception to the general rule of procedural default. *People v. Lewis*, 234 Ill. 2d 32, 42 (2009). While there are two avenues for arguing plain error, defendant relies only on the first prong, which allows a reviewing court to consider a forfeited issue if an error in fact occurred, and the evidence was so closely balanced

that the error alone threatened to tip the scales against the defendant. *People v. Thompson*, 238 Ill. 2d 598, 613 (2010); *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

¶ 36    The first step of plain-error review is to determine whether any error actually occurred. *People v. Kitch*, 239 Ill. 2d 452, 462 (2011); *Thompson*, 238 Ill. 2d at 613. We will begin our analysis there.

¶ 37                    1. Whether the Trial Court Committed Error

¶ 38    Rule 431(b) states:

> "(b) The court *shall ask* each potential juror, individually or in a group, whether that juror *understands and accepts* the following principles: (1) that the defendant is presumed innocent of the charge(s) against him or her; (2) that before a defendant can be convicted the State must prove the defendant guilty beyond a reasonable doubt; (3) that the defendant is not required to offer any evidence on his or her own behalf; and (4) that the defendant's failure to testify cannot be held against him or her; however, no inquiry of a prospective juror shall be made into the defendant's failure to testify when the defendant objects.
>
> The court's method of inquiry shall provide each juror an opportunity to respond to specific questions concerning the principles set out in this section." (Emphases added.) Ill. S. Ct. R. 431(b) (eff. May 1, 2007).

¶ 39    Simply put, the Rule 431(b) admonitions require each juror's understanding and acceptance of (1) the presumption of innocence; (2) the State's burden of proof beyond a reasonable doubt; (3) the fact that the defendant may remain silent and fail to present evidence; and (4) the fact that the defendant's refusal to testify may not be held against him. Our supreme court has emphasized that the trial court must ensure that each juror *both understands and*

- 10 -

*accepts* each of these four principles. *People v. Belknap*, 2014 IL 117094, ¶¶ 44-46; *People v. Wilmington*, 2013 IL 112938, ¶ 32; *Thompson*, 238 Ill. 2d at 607. The questions may be asked of each individual juror or by group, but in either event, Rule 431(b) contemplates " 'a specific question and response process.' " *Wilmington*, 2013 IL 112938, ¶ 32 (quoting *Thompson*, 238 Ill. 2d at 607).

¶ 40    Defendant argues that the trial court violated Rule 431(b) by failing to inquire at all about the second and fourth principles, and by failing to ascertain whether the potential jurors understood the first principle.

¶ 41    During jury selection, the trial court addressed the jury, in part, as follows:

> "The charge in this case is contained in what's called an indictment. You must remember that an indictment is not to be considered as any evidence against Mr. Jackson, nor does the law allow you to infer any presumption of guilt against Mr. Jackson simply because he has been named in an indictment. The indictment is merely the formal way in which a person is placed on trial.

> Under the law, a defendant is presumed to be innocent of the charges against him. This presumption remains with him throughout every stage of the trial and during your deliberations on the verdict and is not overcome unless from all the evidence you are convinced beyond a reasonable doubt that a defendant is guilty.

> The State has the burden of proving the guilt of the defendant beyond a reasonable doubt, and that burden remains on the State.

> The defendant, Mr. Jackson, is not required to prove his innocence nor is he required to present any evidence on his own behalf.

***

It will be your sworn duty to follow the law as I give it to you. If you are convinced beyond a reasonable doubt from all the evidence in the case that Mr. Jackson is guilty as charged in the indictment, it will be your duty to find him guilty.

On the other hand, if after hearing all the evidence you are not convinced beyond a reasonable doubt of Mr. Jackson's guilty, it will be your duty to find him not guilty."

¶ 42    The trial court then engaged in a question-and-answer process with the prospective jurors as a whole:

"There are some basic principles of the American criminal justice system, and I need to make sure that everybody has the ability to follow that.

One of the basic principles and founding principles is that a person is innocent until proven guilty. Is there anyone in this venire, not only sitting in the courtroom but outside, who does not believe that they could follow that basic principle of American criminal justice?

Let the record reflect that none of the venire has raised their hand.

Another basic principle is that the burden is upon the State, that Mr. Jackson is not required to prove anything nor does he need to testify.

Is there anyone in the venire who could not follow or understand that principle of law as well?

Let the record reflect no one in the venire has raised their hand."

¶ 43    The State agrees with defendant that the trial court failed to inquire as to the fourth principle contained in Rule 431(b), that the defendant's failure to testify cannot be held against him. We accept the State's concession. See *Wilmington,* 2013 IL 112938, ¶ 32 (trial court erred in failing to inquire of jury's understanding and acceptance of principle that defendant's failure to testify cannot be held against him). The failure to address even one of the four principles, "by itself, constitutes noncompliance with" Rule 431(b). *Thompson*, 238 Ill. 2d at 607 (trial court failed to mention third principle, that defendant not require to offer evidence or testify).

¶ 44    We also agree with defendant that the trial court did not inquire as to the jurors' understanding of the first principle, the presumption of innocence. Our supreme court has repeatedly emphasized that the court must confirm each jurors' acceptance *and* understanding. *Belknap*, 2014 IL 117094, ¶¶ 44-46; *Wilmington*, 2013 IL 112938, ¶ 32; *Thompson*, 238 Ill. 2d at 607. The trial court asked if the jurors "believe[d] that they could follow" that principle. Asking prospective jurors whether they "could follow" a Rule 431(b) principle may be the rough equivalent of asking them if they *accept* that principle. See, *e.g.*, Black's Law Dictionary 716 (9th ed. 2009) (defining "follow" as "[t]o conform to or comply with" or "to accept as authority"). But it is not the equivalent of asking them if they *understand* that principle. As an example, in its next question to the jury, the trial court asked jurors if they could "follow *or understand*" a particular principle (emphasis added).

¶ 45    The State claims that asking prospective jurors if they "could follow" a certain principle is sufficient to cover both the "understanding" and "acceptance" questions required. It relies in support on *People v. Magallanes*, 409 Ill. App. 3d 720, 729-30 (2011) and *People v. Kidd*, 2014 IL App (1st) 112854, ¶ 40, cases in which this court determined that the trial court had complied with Rule 431(b) by asking the prospective jurors to raise their hands if they "disagree[d]" with a

certain principle. We decline to follow those decisions, as the Illinois Supreme Court has twice held that asking jurors if they disagreed with a principle is not the same thing as asking them whether they *understand* that principle. See *Belknap*, 2014 IL 117094, ¶ 46; *Wilmington*, 2013 IL 112938, ¶ 32.

¶ 46    Finally, we agree with defendant that the trial court did not adequately inquire as to the second principle, that the State must prove the defendant guilty beyond a reasonable doubt. While the court did state that "the burden is upon the State" and asked the jurors whether anyone could not follow or understand that principle, the court did not specify the reasonable doubt standard. The court did mention the reasonable doubt standard at the outset of *voir dire* (see *supra* ¶ 42), but the supreme court has emphasized that the four principles must be part of a specific question-and-answer process. *Wilmington*, 2013 IL 112938, ¶ 32; *Thompson*, 238 Ill. 2d at 607. The committee comments to Rule 431(b) "emphasize that trial courts may not simply give 'a broad statement of the applicable law followed by a general question concerning the juror's willingness to follow the law.' " *Thompson*, 238 Ill. 2d at 607 (quoting 177 Ill. 2d R. 431, Committee Comments).

¶ 47    Based on the State's concession that a Rule 431(b) violation occurred below in at least one instance, as well as the other instances we have cited above, we hold that the trial court failed to comply with Rule 431(b).

¶ 48                                    2. Whether Plain Error Occurred

¶ 49    We next consider whether the error was plain error. Again, under the first-prong plain error that defendant asserts, defendant must show that the evidence at trial was so closely balanced that the error alone tipped the scales toward a guilty verdict. *Id.* at 613; *Piatkowski*, 225 Ill. 2d at 565. Defendant has not met this burden.

¶ 50    Defendant argues that the evidence at trial was closely balanced due to "flaws and gaps" in the State's evidence, in conjunction with the "additional factor" of the jurors' notes, which in defendant's mind indicates that the jury "was troubled by the shortcomings in the evidence" and "struggled to reach a verdict." Defendant claims that "the identification evidence was weak."

¶ 51    The State presented two eyewitnesses who identified defendant at trial: Officer Eichman and Officer Person. Officer Person testified that defendant passed by the passenger side of Officer Person's vehicle, giving him a side view of defendant, as defendant approached Officer Eichman's vehicle for the drug buy. Person also observed the drug transaction between Officer Eichman and defendant as he was parked in an undercover vehicle 30 feet away.

¶ 52    Officer Eichman testified that he met defendant on the 4800 block of West Superior on May 30, 2009, at which time he and defendant exchanged phone numbers, an interaction that took approximately one minute, with Eichman later recording defendant's phone number as "BMX" in the caller identification. Two weeks later, he received a phone call from the number he had identified as "BMX" and set up a drug buy with the individual calling from that phone. Once he had arrived in the general area that had been prearranged, Eichman twice more called that "BMX" phone number to explain his location and the quantity of drugs he wanted. Eichman then engaged in a hand-to-hand drug transaction with an individual whom he recognized as having the "BMX" phone number. He noted that defendant had a "distinctive" beard. He said he had an unobstructed view of defendant both during the transaction and before that time, as Eichman watched defendant approach the car through his rear and side mirrors. The transaction occurred in daylight, at approximately 9:45 a.m. All told, Eichman had two different face-to-face interactions with defendant under circumstances that allowed Eichman to get a good, long, clear look at defendant's face.

¶ 53    After that second interaction—the drug buy—Officer Eichman immediately drove to the police station and identified defendant from a photo array. The jury saw a copy of the photo array, showing where Officer Eichman had drawn a circle around the portion of the photograph showing defendant. And of course, Eichman also identified defendant at trial.

¶ 54    Defendant argues that the photo array was suggestive. Specifically, defendant states that "[a]s this court can observe," he was the only person in the photo array with a "long" beard. But the record does not indicate that defendant filed a motion to suppress the lineup identification as unduly suggestive. Defendant did not object to its admission into evidence, nor does he argue against its admission on appeal.

¶ 55    Defendant also argues that Officer Eichman's "testimony of meeting the seller twice does little to bolster" his identification of defendant, because, according to defendant, Officer Eichman "was impeached by his admission that he did not create a report" of his initial May 30, 2009 interaction with defendant. Defendant does not offer any authority or otherwise explain how this factor was impeaching. In any event, any such "impeachment" was before the jury, which weighed all the evidence and took into account any apparent discrepancies in the evidence. We would add that Officer Eichman explained why he did not generate any paperwork after the initial encounter—because on that date, May 30, 2009, defendant had not sold him any drugs or otherwise committed a crime.

¶ 56    Defendant outlines other pieces of evidence that were not introduced at trial. He notes that, although Officer Eichman testified that he told other officers of his initial meeting with defendant, Officer Eichman "admitted" that no other officer documented the meeting. Defendant also notes that Officer Eichman claimed that another officer made a "contact card" yet he did not know which officer did so. Defendant additionally notes that the State did not introduce Officer

Eichman's telephone into evidence or otherwise prove that the telephone number he used belonged to defendant. We do not believe that the lack of this additional evidence undermines the identification evidence from two eyewitnesses. "[T]he weight to be given the witnesses' testimony, the credibility of the witnesses, resolution of inconsistencies and conflicts in the evidence, and reasonable inferences to be drawn from the testimony are the responsibility of the trier of fact." (Internal quotation marks omitted.) *People v. Temple*, 2014 IL App (1st) 111653, ¶ 49 (quoting *People v. Sutherland*, 223 Ill. 2d 187, 242 (2006)).

¶ 57    In *In re M.W.*, 232 Ill. 2d 408, 435 (2009) and *Piatkowski*, 225 Ill. 2d at 567, the Illinois Supreme Court evaluated whether evidence was closely balanced for purposes of plain-error review, where the "only evidence linking defendant to the crime was the testimony of the two eyewitnesses," (*Piatkowski*, 225 Ill. 2d at 567) by applying the factors identified by the United States Supreme Court in *Neil v. Biggers*, 409 U.S. 188, 199-200 (1972), for assessing the reliability of identification testimony. These factors include: (1) the opportunity the witnesses had to view the criminal at the time of the crime; (2) the witnesses' degree of attention; (3) the accuracy of the witnesses' prior description of the criminal; (4) the level of certainty demonstrated by the witnesses at the identification confrontation; and (5) the length of time between the crime and the identification confrontation. *Biggers*, 409 U.S. at 199-200.

¶ 58    In *Piatkowski*, 225 Ill. 2d 551, the court concluded that the evidence presented on the five factors did not overwhelming favor the State, and defendant had met his burden to show that the evidence was sufficiently closely balanced so as to require a remand for a new trial. But there, the jury had received an erroneous instruction as to how it should weigh and evaluate such identification testimony. *Id.* at 570. Thus, under the totality of the circumstances of that particular case, the court determined that the error was plain error, noting that "the witnesses

were only able to view the suspect for as little as a few seconds, did not previously know the suspect, some discrepancies existed in their prior descriptions and a lapse of more than six months occurred from the crime to the identification." *Id*. Clearly, *Piatkowski* is distinguishable. Here, the identification testimony was far more reliable, and the jury did not receive an erroneous instruction on how to evaluate that very testimony.

¶ 59    In *In re M.W.*, 232 Ill. 2d 408, the minor-respondent, M.W., was adjudicated delinquent where she was part of a group who attacked a 14-year-old boy on a bus. The court determined that the evidence was not closely balanced after applying the *Biggers* factors to the eyewitness evidence. The court noted that one of the witnesses, a passenger on the bus, "viewed the crime in its entirety and testified that she was paying close attention because she was concerned for her own safety." *Id*. at 435. The court further noted that "M.W. was on the bus when the officer boarded and the witness identified her as one of the attackers while all were still present at the crime scene." *Id*. Thus, as the court explained, "there was no measurable delay between the witness's observing the crime being committed and her pointing out M.W. to the officer." *Id*. The court stated: "Even if we were to conclude that the victim, due to fear or the stress of the situation, may not have been able to identify each of his assailants with absolute certainty, *the testimony of the passenger alone* is sufficient to weigh the [*Biggers*] factors in favor of the State." (Emphasis added.) *Id*. The court cited its previous holding in *Piatkowski*  that "a 'positive identification by a single eyewitness who had ample opportunity to observe is sufficient to support a conviction.' " *Id*. (quoting *Piatkowski*, 225 Ill. 2d at 566).

¶ 60    Applying the five *Biggers* factors here, we conclude that they were favorable to the State, and defendant has failed to show that the identification testimony of the two police officers was unreliable. The first factor, the opportunity to view the offender, favors identification. After

defendant had approached Officer Eichman's car in the daylight, Officer Eichman had an unobstructed view of defendant as he engaged in the hand-to-hand drug transaction with defendant; this transaction was observed by Officer Person, who first saw defendant from a side view and then watched the drug buy from 30-50 feet away. And that was the second time Eichman had seen defendant; the first time was when they first met and exchanged phone numbers. The second factor, the witnesses' attentiveness, strongly favors reliability. This was not a split-second reaction by a layperson to an unexpected crime; this was a planned controlled purchase of drugs by police officers, where the officers' degree of attention on the transaction was obviously focused. The accuracy of the witnesses' prior description of the offender likewise favors reliability; Officer Eichman had accurately described defendant immediately after the drug transaction. Fourth, there is no indication of any uncertainty in their identifications of defendant. Finally, the length of time between the crime and the identification confrontation favors reliability, as Officer Eichman identified defendant in a photo array that took place less than an hour after he had purchased the drugs from defendant.

¶ 61    We agree with the State that defendant's reliance on *People v. Johnson*, 2012 IL App (1st) 091730, is unavailing. There, the court determined that the trial court's Rule 431(b) error was plain error where the evidence was closely balanced. *Id*. ¶ 48. But, as the State notes, in *Johnson*, the defendant had presented three witnesses to establish an alibi defense placing him at another location (hundreds of miles away in a different state) at the time of the shooting at issue, and whose testimony conflicted with that of the two eyewitnesses presented by the State. In the instant case, defendant presented no evidence, we have already found the identification evidence to be reliable, and there was no conflict in the testimony the jury heard.

¶ 62    Defendant also cites *People v. Gray*, 406 Ill. App. 3d 466, 474 (2010) for the proposition that lengthy jury deliberations, and a note informing the court that the jury could not reach a consensus, are factors to consider when deciding whether evidence was closely balanced. But "the length of time a jury deliberates is not always an accurate indicator of whether the evidence was closely balanced." *People v. Walker*, 211 Ill. 2d 317, 342 (2004). Instead, a jury's difficulty in reaching a verdict is but a single factor to be considered in determining whether the evidence was closely balanced. *People v. Vasquez*, 368 Ill. App. 3d 241, 251 (2006) (despite jury note indicating deadlock, evidence not closely balanced where two officers testified they saw defendant with firearm, despite defense witness contradicting that testimony); *People v. Smith*, 341 Ill. App. 3d 530, 543 (2003).

¶ 63    In *Smith*, defendant was convicted of first degree murder and attempted armed robbery. *Smith*, 341 Ill. App. 3d at 532. He appealed the dismissal of his *pro se* postconviction petition. As part of its analysis, the court noted that the record positively rebutted defendant's allegation that the evidence at his trial was so closely balanced that the new evidence would have changed the result. *Id*. at 541.

¶ 64    The court acknowledged that, after four hours of deliberation, the jury had sent a note to the trial judge, stating that it could not come to an agreement after four votes; the trial court had ordered the jury to continue deliberating. Soon thereafter, because it was 10 p.m., the jury was sequestered, and the jury had returned the verdicts of guilty on the following court day. *Id*. at 543. The court concluded that four hours was not a long enough interval to consider the jury deadlocked, given the amount of testimony in the case. *Id*. The court additionally noted that the jurors had not specifically indicated they were uncertain about the identification testimony. *Id*. As the court explained: "Because it is unknown why the jury may have had difficulty reaching an

- 20 -

agreement, we must view the evidence objectively to determine whether it was closely balanced. Given that we have found the evidence against defendant to be overwhelming, the jury's deliberations alone do not indicate that the evidence was closely balanced." *Id.*

¶ 65    Here, the jury began deliberating at 2:47 p.m. It sent out the note at 4:10 p.m., asking the three questions noted above. The jury then sent out a note at 4:45 p.m., stating it was deadlocked at 11-1. When told that its verdict must be unanimous and to continue deliberating, the jury returned its verdict a little after 5 p.m. We find nothing particularly lengthy or controversial about these jury deliberations that would persuade us that the evidence was closely balanced.

¶ 66    In sum, our review of the evidence, including the reliable eyewitness identification testimony from two police officers involved in the controlled narcotics purchase, particularly Officer Eichman, who made the controlled purchase of the heroin from defendant, shows the evidence was not closely balanced. Defendant has failed to establish that the Rule 431(b) error constituted plain error. Because defendant has failed to meet his burden of showing plain error, reversal is not warranted on the sole basis that the trial court erred in admonishing the prospective jurors under Rule 431(b).

¶ 67                         B. Preliminary *Krankel* Inquiry

¶ 68    We now address the issue regarding the trial court's preliminary *Krankel* inquiry. Defendant claims that the preliminary *Krankel* inquiry conducted by the trial court contained multiple errors. The State agrees, conceding that a remand is appropriate for a new *Krankel* hearing. Whether the circuit court properly conducted a preliminary *Krankel* inquiry is a legal question that we review *de novo*. *People v. Jolly*, 2014 IL 117142, ¶ 28.

¶ 69    In *People v. Krankel*, 102 Ill. 2d 181 (1984), the Illinois Supreme Court held that, under certain circumstances, a defendant is entitled to the appointment of new counsel during a

posttrial hearing on his trial attorney's ineffectiveness. New counsel is not automatically required when a defendant raises a posttrial claim of ineffective assistance of trial counsel. *People v. Moore*, 207 Ill. 2d 68, 77 (2003). Instead, the circuit court should first examine the factual basis of the defendant's claim. *Id.* at 77-78. If the court determines that the defendant's factual claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion. *Id.* at 78. But if the defendant's allegations show possible neglect of the case, new counsel should be appointed to fully prosecute the ineffectiveness claim before the trial court. *Id.* at 78-79. The procedure developed in *Krankel* is intended to fully address a defendant's *pro se* posttrial claims of ineffective assistance of counsel at the trial level, which would serve to potentially limit issues on appeal or, if such issues are raised on appeal, would provide a sufficient record for the reviewing court to consider those claims. *People v. Jolly*, 2014 IL 117142, ¶¶ 29, 38.

¶ 70    In this case, on remand from this court, defendant indicated that he wished to raise claims concerning his trial counsel's ineffective assistance. The court conducted a *Krankel* inquiry. One of defendant's trial attorneys, Mr. Benesh, was present, but the lead trial counsel, Ms. Roos, was not. Defendant began to present his argument, apparently from a written document. The trial judge advised defendant that he should not read to her but argue to her. After defendant continued to read from a document, the court again told him to argue, not read to her. Defendant indicated to her that it was the only way he could present his argument. The court noted that defendant was reading from an eight-page document and initially indicated that he would not be allowed to read it in its entirety. Ultimately, as far as the record discloses, the trial court did allow defendant to read the entire document, or at least to make his full record to the trial judge.

¶ 71    Defendant made multiple claims of ineffective assistance of trial counsel. First, he claimed that Roos and Benesh failed to conduct a proper investigation, namely by failing to introduce the testimony of Isaac Williams, who apparently had been arrested on the same day for the same offense (purchasing narcotics from Officer Eichman) as defendant. Defendant claimed that Mr. Williams would swear that he, not defendant, was the individual on the BMX bike who bought drugs from Eichman. Defendant argued that Williams was willing to cooperate and was not difficult to locate because he was incarcerated, at which point the trial court interjected that Mr. Williams "was in custody, correct, with you?" Defendant replied, "No, he is not." The court then stated, "He was at the time. Go on."

¶ 72    Defendant next claimed that trial counsel incorrectly advised him that they could not move to suppress the officer's identification because he was a police officer. Third, defendant claimed that counsel was ineffective for failing to object to the faulty Rule 431(b) admonishments. Finally, defendant claimed that his lead counsel had a conflict of interest. According to defendant, his counsel advocated going to trial, rather than accepting a plea bargain, because she needed the trial experience to advance her career.

¶ 73    After hearing defendant's *pro se* presentation, the trial court ruled that defendant's claims did not rise to the level of ineffective assistance under *Strickland v. Washington*, 466 U.S. 668 (1984). The court found that defense counsel properly investigated the case and the possible use of Mr. Williams. In regard to counsel's failure to object to faulty Rule 431(b) admonishments, the court ruled as follows:

> "[T]he court acted properly and asked the [Rule 431(b)] questions in the correct manner, as indicated because the appellate court did not even remand for that. So there is no issue on that. That was not raised, nor did the court in any way commit error in asking the

[Rule 431(b)] questions. The court asked the entire venire, which is completely proper and has been upheld numerous times. So as to that claim, that claim fails."

¶ 74    Ultimately, the court ruled as follows: "The court does not find that these attorneys acted ineffectively. The court does not find you have met your burden. *** You have failed in your *Krankel* motion in regards to ineffective assistance of counsel. That is denied."

¶ 75    Defendant claims that the following errors occurred at the *Krankel* hearing: (1) The trial court did not first consider the claim for possible neglect and then decide whether to appoint independent counsel but, instead, proceeded directly to the merits and ruled that defendant failed to establish a *Strickland* claim; (2) The trial court relied on evidence beyond the record—that the purported witness, Mr. Williams, had been incarcerated with defendant—in rejecting defendant's claims of inadequate investigation by trial counsel; (3) The trial court misinterpreted our mandate and concluded that defendant's claim of ineffective assistance related to the Rule 431(b) admonishments was not to be considered; and (4) The trial court did not inquire of trial counsel about defendant's complaints of ineffectiveness.

¶ 76    The State agrees with the first three of these arguments and concedes that defendant is entitled to a new *Krankel* inquiry. As we have in the past, we appreciate the State's candor. See *People v. Rowjee*, 308 Ill. App. 3d 179, 185 (1999) ("The State's concession is a welcome one. In a criminal prosecution, an assistant Attorney General, no less than an assistant State's Attorney, is the representative of all the people, including the defendant, and it is as much his or her duty to safeguard the constitutional rights of the defendant as those of any other citizen."). We agree with the parties that these three errors occurred and that remand for a new preliminary *Krankel* inquiry is warranted.

¶ 77    As we have already explained, the purpose of the preliminary *Krankel* hearing is to determine, in a neutral and nonadversarial proceeding, the factual basis for defendant's *pro se* claims of ineffective assistance and, if possible neglect by trial counsel has been demonstrated, to appoint new counsel for defendant to fully present the *Strickland* claim to the trial court in an adversarial proceeding. *Moore*, 207 Ill. 2d at 78-79. That did not occur here. The trial court moved directly to the merits of the claim and rejected them as falling short of the standard set forth in *Strickland*, without first attempting to determine whether sufficient facts were alleged to show possible neglect and deciding whether to appoint conflict counsel. See *People v. Cabrales*, 325 Ill. App. 3d 1, 5 (2001) ("We must conclude there was no preliminary investigation because the court proceeded to a full hearing on the merits of defendant's *pro se* motion without any discussion or resolution of the need for a preliminary investigation for appointment of conflict counsel."). This error, alone, requires a new preliminary *Krankel* hearing. *Id.*; see *Moore*, 207 Ill. 2d at 81.

¶ 78    We also agree with the parties that the trial court improperly considered evidence beyond the record. The record did not support the fact that Mr. Williams, the witness purportedly willing to confess to the crime, had been incarcerated with defendant. Whether that fact was ultimately true or false, which we do not know, we agree with the parties that this information is not in the record, and the trial court should not have relied on it. See *Jolly*, 2014 IL 117142, ¶ 36 (error to rely on matters outside record in evaluating defendant's claims during preliminary *Krankel* inquiry).

¶ 79    We also agree with the State and defendant that the trial court misconstrued our mandate in determining that the claim of ineffective assistance relating to the Rule 431(b) admonitions was not properly before the trial court on remand. When we remanded the matter in our previous

order, we ordered that "defendant shall receive either the assistance of counsel or a proper admonishment and waiver under [Illinois] Supreme Court Rule 401(a) before proceeding on his posttrial motions." *Jackson*, 2013 IL App (1st) 112269-U, ¶ 34. But we expressly stated that "[i]n view of our decision, *it would be premature to address defendant's argument* that, because the trial court failed to comply with Illinois Supreme Court Rule 431(b), his conviction must be reversed." (Emphasis added.) *Id.* ¶ 32. Our previous order did not, in any way, suggest approval of the Rule 431(b) admonishments, nor did it limit the trial court's review of them in posttrial proceedings, either in the context of a *Strickland* claim or as a freestanding argument in a motion for new trial.

¶ 80     Defendant further argues that the trial court failed to make an inquiry of counsel and did not even require the presence of his lead trial counsel, who was the main subject of several of his complaints.  The State does not concede this error.  The State is correct that a trial court is not *automatically* required to inquire of counsel during the preliminary phase of a *Krankel* hearing. *Moore*, 207 Ill. 2d at 77. On the other hand, typically, "some interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is permissible and usually necessary in assessing what further action, if any, is warranted on a defendant's claim." *Id*. at 78. At this preliminary stage of the *Krankel* inquiry, "[t]rial counsel may simply answer questions and explain the facts and circumstances surrounding the defendant's allegations," but not argue his or her side of the story. *Id*. The key point, at this preliminary *pro se* stage, where the only question is whether defendant has demonstrated possible neglect of the case based on the defendant's factual allegations, is that any participation by trial counsel not become adversarial. See *Jolly*, 2014 IL 117142, ¶ 38 ("Because a defendant is not appointed new counsel at the preliminary *Krankel* inquiry, it is critical that the

State's participation at that proceeding, if any, be *de minimis*" and "the State should never be permitted to take an adversarial role against a *pro se* defendant at the preliminary *Krankel* inquiry.").

¶ 81     Because the trial court merged the preliminary phase of the *Krankel* hearing with a substantive hearing on the merits of the claim, the question of whether trial counsel should have been present is difficult to gauge. As we have already found error at the preliminary *Krankel* hearing sufficient to vacate the trial court's ruling, we will only mention here that the proper course, on remand, would be for the trial court to ensure trial counsel's presence at the preliminary phase of the *Krankel* hearing if necessary to answer any basic factual or foundational questions about the trial proceedings. Should the trial court find possible neglect and appoint new counsel for a full adversarial hearing on the ineffective-assistance claim, it would be incumbent on new counsel and the State to secure the presence of whichever witnesses they deem necessary at the hearing.

¶ 82     For all of these reasons, we vacate the trial court's ruling at the *Krankel* hearing and remand this cause to the circuit court for a new preliminary *Krankel* hearing.

¶ 83     C. Defendant's Right to Represent Himself at Later Postconviction Proceedings

¶ 84     After the trial court denied defendant's ineffective assistance claim at the *Krankel* hearing, defendant indicated to the court that he wished to proceed *pro se* on the remainder of the posttrial proceedings—the motion for new trial and, if unsuccessful, sentencing. The following exchange occurred between the trial court and defendant:

> "THE COURT:  Sir, you do have the right to have an attorney, sir, at this hearing.
>
> DEFENDANT:  I don't want an attorney, [Y]our Honor.

THE COURT: I have to advise you of that, sir. You can have the right to have an attorney to represent you in this sentencing hearing.

DEFENDANT: I don't want an attorney.

THE COURT: Are you a lawyer?

DEFENDANT: No, ma'am.

THE COURT: Do you have a law degree?

DEFENDANT: No, ma'am.

THE COURT: Do you have a college degree?

DEFENDANT: Yes, ma'am.

THE COURT: Do you understand the perils in representing yourself?

DEFENDANT: No, ma'am.

THE COURT: You don't understand the perils?

DEFENDANT: No, ma'am.

THE COURT: Then I will—because if you don't understand the ramifications, then you are not qualified."

¶ 85     The court then ordered the assistant public defender to represent defendant at the sentencing hearing, at which time counsel informed the court that defendant also wished to present a motion for new trial. Counsel then proceeded to argue the motion for new trial. The trial court denied it and then conducted a sentencing hearing with counsel representing defendant.

¶ 86     Defendant argues that the trial court denied him his constitutional right to self-representation at the posttrial proceedings that followed the *Krankel* hearing. The State agrees

that the cause should be remanded for new proceedings on the motion for new trial and sentencing "because defendant invoked his right to represent himself."

¶ 87    We also agree. A defendant has a constitutional right to represent himself. *People v. Baez*, 241 Ill. 2d 44, 115 (2011); *Faretta v. California*, 422 U.S. 806, 835 (1975). A defendant may represent himself as long as the court finds that he has knowingly and intelligently waived his right to counsel. *Baez*, 241 Ill. 2d at 116. The inquiry is not into the defendant's qualifications or ability to appropriately defend himself at trial. *Id.*; *People v. Woodson*, 2011 IL App (4th) 100223, ¶ 24; *People v. Ward*, 208 Ill. App. 3d 1073, 1082 (1991). The United States Supreme Court specifically rejected that inquiry. *Faretta*, 422 U.S. at 836 (defendant's "technical legal knowledge *** was not relevant to an assessment of his knowing exercise of the right to defend himself"); see also *Woodson*, 2011 IL App (4th) 100223, ¶ 25 (noting that *Faretta* rejected any inquiry into the adequacy of defendant's legal knowledge or expertise to represent himself effectively).

¶ 88    Rather, the relevant question is whether the defendant has a " 'full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' " *Baez*, 241 Ill. 2d at 117 (quoting *People v. Lego*, 168 Ill. 2d 561, 564 (1995)). To that end, a defendant requesting to proceed *pro se* " 'should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open.' " *Id.* (quoting *Lego*, 168 Ill. 2d at 564, quoting *Faretta*, 422 U.S. at 835).

¶ 89    The trial court did not make defendant aware of the dangers and disadvantages of self-representation. The trial court asked the defendant if he knew what those perils were, the defendant said he did not, and the trial court denied his request. The court found that defendant was "not qualified" to represent himself. As a factual matter, the court may have been correct,

but as a basis for denying him his right to represent himself, it was error. See *Woodson*, 2011 IL App (4th) 100223, ¶ 25 (trial court erred in denying request to proceed *pro se* based on fact that "defendant did not have sufficient legal knowledge and expertise to represent himself"); *Ward*, 208 Ill. App. 3d at 1085 ("Because the trial court *** denied defendant his constitutional right to self-representation on the ground that the court viewed defendant as incapable of adequately representing himself, defendant's conviction is reversed and the cause is remanded for a new trial.").

¶ 90    Because the court erred in denying defendant his right to proceed *pro se* following the *Krankel* hearing, we vacate the trial court's ruling denying defendant a new trial and remand for a new hearing on that motion. We likewise vacate defendant's sentence and remand for a new sentencing hearing.

¶ 91                              D. Remand Before a New Judge

¶ 92    Defendant argues that any further proceedings in the trial court should take place before a different trial judge. He points to the trial judge's criticism of his reading his *Krankel* argument from a document; the fact that the trial judge, several times, corrected his mispronunciation of words, twice telling him, "You really need to learn how to say the words," and the fact that the court held defendant in contempt. The State argues that remand before a new judge is not warranted. The State correctly notes that defendant has not challenged the contempt finding on appeal, and it claims that other comments made by the trial court do not "rise to the level necessary that requires this Court to order the matter reassigned."

¶ 93    In *Jolly*, 2014 IL 117142, ¶ 46, after the supreme court held that the preliminary stage of the *Krankel* hearing became impermissibly adversarial, warranting a new preliminary *Krankel* hearing, the supreme court remanded the matter to a different trial judge. The supreme court

noted that other appellate decisions likewise adopted the remedy of remand to a different judge in a similar context. *Id.* ¶ 35 (quoting *People v. Fields*, 2013 IL App (2d) 120945, ¶ 42, citing *Cabrales*, 325 Ill. App. 3d at 6); see also *People v. Robinson*, 2015 IL App (1st) 130837, ¶ 83.

¶ 94    In *Cabrales*, 325 Ill. App. 3d at 5-6, as in this case, the trial court skipped the preliminary phase of the inquiry altogether and proceeded to a full hearing on the merits of defendant's claim of ineffective assistance, and this court determined that remand should be before a different judge. Having reviewed the record in its entirety and in light of the case law we have cited, and considering the additional fact that the trial court has now ruled against defendant twice on these posttrial claims (each ruling having been vacated by this court), we believe that course of action to be appropriate in this matter as well. We therefore remand this matter to a new trial judge for consideration of all of defendant's posttrial claims—a preliminary *Krankel* hearing as well as any further proceedings under *Krankel* if necessary; if necessary, his motion for new trial; and if necessary, his sentence.

¶ 95    Because of the unique posture of this case, we leave one final note. In our opinion today, among other things, we have found that the trial court did not comply with Rule 431(b), but that this error was not plain error because the evidence at trial was not closely balanced. We are aware that our decision on the Rule 431(b) argument will have precedential effect on the trial court's consideration of one of defendant's posttrial claims, which is that his trial counsel was ineffective for not *objecting* to the Rule 431(b) violations at trial.

¶ 96    On the one hand, our decision validates defendant's claim of an underlying Rule 431(b) violation, which will make it easier for defendant to show the first prong of his *Strickland* claim below—that his lawyer acted deficiently in failing to object to it. But on the other hand, our finding that this error did not warrant a new trial because the evidence was not closely balanced

could be viewed as dooming defendant under the second prong of *Strickland*, where defendant must show that he suffered prejudice from the error. First-prong plain error requires a showing that "the evidence is so closely balanced the alleged error alone would tip the scales of justice." *People v. Taylor*, 2015 IL App (4th) 140060, ¶ 28 (citing *People v. Herron*, 215 Ill. 2d 167, 178 (2005)). Prejudice under *Strickland* requires a showing that "there was a reasonable probability that the result would be different but for counsel's error." *Id.* (citing *Strickland*, 466 U.S. at 694). These two tests are functionally the same. See *id.* ("the first prong of the plain-error doctrine and the second prong of an ineffective-assistance-of-counsel claim involve substantially the same analysis"). Our supreme court has likewise noted the functional similarity between the two doctrines. *People v. White*, 2011 IL 109689, ¶ 133 ("Plain-error review under the closely-balanced-evidence prong of plain error is similar to an analysis for ineffective assistance of counsel based on evidentiary error insofar as a defendant in either case must show he was prejudiced ***.").

¶ 97 In *Taylor*, the defendant was convicted of aggravated battery and complained on appeal (among other things) that the State elicited testimony from his wife in violation of the marital privilege. *Taylor*, 2015 IL App (4th) 140060, ¶ 16. His attorney had not objected to the testimony at trial or raised the issue posttrial. *Id*. ¶ 22. Defendant raised this issue on direct appeal, both as plain error and in the context of an ineffective-assistance claim, that his lawyer was ineffective for failing to object to the testimony. The appellate court declined to consider the defendant's ineffective-assistance claim because the trial record was not fully developed on that issue; the court held that a postconviction proceeding, where the defendant could sufficiently develop the record, was the preferred route. *Id*. ¶ 26. The appellate court then declined to consider the issue as plain error, because of the substantial similarity between the first-prong

plain-error doctrine and the requirement of prejudice under *Strickland*. *Id*. ¶ 28. The court reasoned that, "[i]f this court engaged in a plain-error analysis, yet reserved the ineffective-assistance-of-counsel claim, we could arguably secure a *res judicata* or collateral estoppel bar on the claims we encourage him to raise in a subsequent postconviction petition." *Id*. ¶ 29.

¶ 98    We are presented with a similar concern. By ruling on the Rule 431(b) issue, we have created law in this case that will guide the trial court with regard to the *Strickland* claim defendant will assert on remand. Though none of the members of this appellate panel were a part of the previous appellate decision in this case, we assume that this very concern is why we declined to consider, as premature, the Rule 431(b) issue the last time it was before us, when we remanded for proper Rule 401(a) admonishments. See *Jackson*, 2013 IL App (1st) 112269-U, ¶ 34 ("[i]n view of our decision, *it would be premature to address defendant's argument* that, because the trial court failed to comply with Illinois Supreme Court Rule 431(b), his conviction must be reversed" (emphasis added)).

¶ 99    But there are differences between this case today versus nearly three years ago, and a difference between this case and *Taylor*.

¶ 100   The difference between this case and *Taylor* is that here, defendant has raised several *Strickland* arguments below, only one of which concerns the Rule 431(b) violation. He has also claimed that trial counsel failed to present a witness who would have potentially cleared him of all wrongdoing, that trial counsel failed to file a motion to suppress only because the identifying witness was a police officer, and that trial counsel advised going to trial, rather than taking a plea, to advance her career. Though we have found that the Rule 431(b) error, *standing alone*, did not warrant a new trial, the calculus of prejudice might change if the trial court found merit

in any of those other claims, too. We express no opinion on what that calculus might be, only that it could conceivably be different if more than one error were found by the trial court.

¶ 101   The primary difference between this case today, versus our 2013 decision, is the simple passage of time. This will be our second remand of the case, and by the time this decision is handed down, defendant will be just a few weeks away from release after serving his sentence. This is the second time defendant has asked us to review the Rule 431(b) issue, and he should not have to ask a third time.

¶ 102                                III. CONCLUSION

¶ 103   We hold that the circuit court's noncompliance with Rule 431(b) was not plain error warranting a new trial.  We vacate the trial court's ruling at the *Krankel* hearing because of the errors we have enumerated above. Because defendant was denied his right of self-representation at the remaining stages of the proceedings, we likewise vacate both the trial court's ruling on the motion for new trial and defendant's sentence. We remand this matter to a different trial judge for a new preliminary *Krankel* hearing, for hearing on a motion for new trial if necessary, and for sentencing if necessary.

¶ 104   Affirmed in part and vacated in part; cause remanded.