NOTICE
Decision filed 09/07/16. The text of this decision may be changed or corrected prior to the filing of a Peti ion for Rehearing or the disposition of the same.

2016 IL App (5th) 130554

NO. 5-13-0554

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 07-CF-211 |
| | ) | |
| BRANDON JOHNSON, | ) | Honorable |
| | ) | James Hackett, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court, with opinion.
Presiding Justice Schwarm and Justice Moore concurred in the judgment and opinion.

**OPINION**

¶ 1    The defendant, Brandon Johnson, appeals the order of the circuit court of Madison County that denied his petition for postconviction relief. For the following reasons, we affirm.

¶ 2                                    FACTS

¶ 3    The complicated history of this case requires that we recite the facts in extended detail. In April 2009, the defendant was convicted, following a jury trial, of aggravated battery of a child. The conviction resulted from events that allegedly occurred on or about January 22, 2007. The crux of the State's theory was that the defendant had severely

1

physically abused his three-month-old son, T.M., which resulted in a constellation of injuries, causing T.M. great bodily harm. A few days prior to trial, the State amended the charge in the indictment, adding more limiting language, which then alleged that defendant "shook and beat T.M. causing a skull fracture and a broken arm, in violation of 720 ILCS 5/12-4.3."

¶ 4     The record reveals that Dr. Spivey was on call the afternoon that T.M. was brought to Children's Hospital in St. Louis, Missouri. Dr. Spivey is a physician with special training in child protection, which included as a part of that training "putting everything together on what might have caused injuries." Dr. Spivey testified that on the day T.M. arrived at Children's Hospital, she interviewed the defendant, who indicated that there were "no falls, no accidents." At the State's request, Dr. Spivey authored an affidavit that identified six injuries suffered by T.M. Those injuries were identified as (1) "a right parietal comminuted skull fracture with associated soft tissue swelling," which means a "break in the bone on the side of the head that's complex, meaning it took a lot of force"; (2) bilateral acute subdural hemorrhage(s), which means "bleeding around the brain"; (3) chronic bilateral subdural hematoma(s), which means "older brain bleeds"; (4) a "left distal radial and ulnar buckle fracture," which means a fracture of the two bones in T.M.'s forearm; (5) "global hypoxia ischemic injury," which means a "widespread brain injury" that is an "injury to the brain matter itself"; and (6) "retinal hemorrhages," which refers to bleeding at the back of the eyes, is frequently associated with acceleration-deceleration injuries to the brain, and is used as part of the diagnosis for "shaken baby syndrome." The State alleged that defendant caused these severe injuries to T.M.

2

¶ 5    In his defense, the defendant claimed that while holding T.M., he tripped over the baby's "bouncy chair" and fell in such a manner that T.M.'s head struck a coffee table. The defendant further explained that when he fell, he landed on top of T.M. During trial, the State posed a hypothetical to Dr. Spivey as to whether T.M.'s injuries could have occurred as a result of the fall described by the defendant. Over objection by defense counsel, Dr. Spivey opined that "[o]ne fall with one impact would not have caused all these areas; all this injury in different areas of [T.M.'s] body." Dr. Spivey further testified that, to a reasonable degree of medical certainty, the injuries to T.M. were "inflicted injuries" and "[t]hey are nonaccidental injuries."

¶ 6    The State also presented testimony from Dr. Jeffrey Leonard, a pediatric neurosurgeon at Children's Hospital. Dr. Leonard was the admitting neurosurgeon for T.M. and was responsible for supervising his care while at Children's Hospital. Dr. Leonard was also responsible for reviewing all cases of traumatic brain injury that were admitted to the hospital. With the assistance of a computerized tomography (CT) scan shown to the jury, Dr. Leonard testified that T.M. had suffered a comminuted complex skull fracture that was depressed below the level of the skull. Dr. Leonard also explained the neuroanatomy of subdural hematomas and explained their significance in causing the brain damage suffered by T.M. As a part of his medical opinions regarding T.M.'s complex skull fracture and the existence of the subdural hematomas, Dr. Leonard testified that, in his experience, these types of injuries required a fall from a distance "of greater than 4 feet." Ultimately, Dr. Leonard opined, "In the constellation of [T.M.'s] injuries, I have never seen a simple fall produce this level of injury." Dr. Leonard

rendered an opinion, to a reasonable degree of medical certainly, that "[T.M.] was the victim of nonaccidental trauma."

¶ 7   Counsel for the defendant did not present any of his own expert witnesses. Instead, he chose to cross-examine the State's witnesses with regard to both the State's theory of the case and the defendant's account that the injuries suffered by T.M. were accidental. More specifically, defense counsel questioned Dr. Spivey regarding her knowledge and expertise by asking her whether she was familiar with the New England Journal of Medicine and the American Journal of Forensic Medicine and Pathology. Defense counsel then used a medical article to cross-examine Dr. Spivey regarding the issue of "shaken baby syndrome," asking whether she agreed with the statement that, "Objective evidence strongly suggests that we should abandon the term shaken infant syndrome and instead use an actual description of the injury mechanism, i.e., rotational deceleration. Admittedly we do not know the force required to cause the injury." The defendant's trial counsel also elicited testimony that Dr. Spivey had never been provided with the defendant's written statement, wherein he gave his version of what had occurred during the fall over the "bouncy" chair. Defense counsel indicated he had been through all of the medical records from Children's Hospital, and Dr. Spivey's name appeared on only two entries out of all the pages produced. In addition to the cross-examination tactics attacking Dr. Spivey's credibility, defense counsel also spent a considerable amount of time questioning Dr. Spivey about the biomechanical mechanism of "shaken baby syndrome" and the causes of subdural hematomas and hemorrhagic brain bleeds, including the multitude of causes for acceleration-deceleration injuries, retinal

4

hemorrhages, and other forms of brain injuries. In essence, trial counsel attempted to invalidate Dr. Spivey's testimony and attack her credibility through the technique of cross-examination.

¶ 8    The defendant's trial counsel also cross-examined Dr. Leonard. Counsel posited the defendant's version of events as a hypothetical and asked whether such a scenario could cause the type of skull fracture suffered by T.M. Dr. Leonard agreed that such a fall could, indeed, result in such a fracture. When defense counsel began inquiring about the subdural hematomas, Dr. Leonard disagreed and indicated that the kind of brain movement suggested by the hypothetical did not produce the types of subdural hemorrhages diagnosed in T.M. Defense counsel continued his cross-examination with variations of the hypothetical facts that supported the defendant's version of what had occurred, all in an attempt to prove that the injuries were accidental.

¶ 9    In addition to the medical testimony, the State also presented the voluntary, written statement given to police by the defendant on January 23, 2007, the day after T.M. was taken to the hospital. In that statement, the defendant conceded that when he and T.M.'s mother had taken T.M. to the hospital the day before, the defendant had not informed any medical personnel about the alleged fall with T.M. In fact, the defendant had "denied dropping him or bumping into anything with him." At the conclusion of the State's case, the defendant's attorney made a motion for acquittal. He argued that the State had failed to prove that T.M.'s injuries were inflicted by the defendant and not the result of the fall as described by the defendant. The defendant's counsel also argued that the medical discrepancies regarding the nature of T.M.'s injuries that he elicited during his

cross-examination of Dr. Spivey and Dr. Leonard proved that the State could not meet its burden of proof. The State responded that both physicians had testified that the injuries suffered by T.M. were "nonaccidental" and that the State's burden only required proof of great bodily harm. The court denied the defendant's motion.

¶ 10    The only individual called during the defendant's case was Sergeant Gunderson, who indicated that he took the defendant's written statement. He could not remember whether he gave that written statement to the hospital or any medical personnel. The defense rested without calling the defendant as a witness. Counsel for the defendant renewed his motion for acquittal, and the court denied the defendant's motion. The jury subsequently found the defendant guilty.

¶ 11    On May 12, 2009, the defendant filed a *pro se* motion for a new trial and a *pro se* motion in arrest of judgment. In paragraph 9 of his motion for a new trial, the defendant claimed:

> "The defendant's counselor was ineffective in his assistance to the defendant, in that he failed to file a motion for or request a continuance to adjust to the changes in the charges, he failed to file the paper motion(s) in regards to the admissibility of certain evidence, he failed to diligently attempt to retain the services of a forensic pathologist or a medical examiner prior to trial, he failed to interview any of the state's witnesses prior to trial, and he was unprepared for trial; he was concerned more with seeking a favorable plea agreement than with providing an effective defense."

Paragraphs 10 through 16 of the *pro se* motion for new trial referred to the medical evidence introduced by either Dr. Spivey or Dr. Leonard. Defense counsel had also filed a posttrial motion, wherein he claimed, among other matters, that there was insufficient medical evidence to support a finding of guilt and that the court erred in denying the defendant's motion for a continuance after the State dismissed three of the existing counts of the indictment and amended a count just prior to trial.

¶ 12    On May 21, 2009, the parties convened for a hearing on the defendant's posttrial motions and for sentencing. The court recognized that the defendant had filed several *pro se* motions, including a motion for a new trial. The defendant's trial counsel had also filed a motion for a new trial. Some of the defendant's claims of error overlapped those raised by his trial counsel. Other allegations in the defendant's *pro se* motions raised the issue of ineffective assistance of counsel. The trial judge explained to the defendant and his counsel that the defendant's *pro se* allegations of ineffective assistance of counsel required further inquiry, specifically referencing "*Krankel*" (see *People v. Krankel*, 102 Ill. 2d 181, 464 N.E.2d 1045 (1984)). The court recognized its obligation to allow the defendant to explain each and every allegation in his *pro se* posttrial motion, so that the court could make a preliminary determination as to whether the defendant needed separate counsel appointed to assist the defendant with his posttrial motions. After some discussion with the defendant, the court held that, based upon the allegations set forth in the *pro se* motions and the fact that the court had heard the evidence at trial, there was no need to have a separate attorney appointed to advance the arguments being made by the defendant. Thereafter, even though the court did not believe the defendant's contentions

7

were "meritorious," the court allowed the defendant to explain his reasoning for each and every allegation in his *pro se* petition that, in the defendant's mind, supported a claim for ineffective assistance of counsel (hereafter, the "*Krankel* hearing"). The court also combined the defendant's *pro se* motion in arrest of judgment with the ongoing discussion of the defendant's allegations in his *pro se* motion for a new trial. As to each and every allegation in the motion to arrest judgment, the court continued to allow the defendant to explain, in detail, the nature of his concerns.

¶ 13 One of the defendant's major claims of ineffective assistance of counsel dealt with the failure to retain an expert witness to refute the affidavit of Dr. Spivey and the failure of trial counsel to offer the jury a medical explanation for T.M.'s injuries. The defendant claimed he was prejudiced by the use of Dr. Spivey's affidavit, alleging that the injuries were all listed separately. "[T]hey split them up *** to make it seem like I beat the crap out of my son. *** But my son had not one bruise on his body, not one broken rib." The defendant claimed the State "listed all these individual results as a way to throw the jurors off, when they were all part of one main action."

¶ 14 The court allowed the defendant to discuss the pros and cons of the impact of Dr. Spivey's testimony. In response, however, the court indicated that the doctor's testimony was "much more clear" than the defendant claimed. After having allowed the defendant to fully state the bases for each of the claims set forth in his *pro se* motion for new trial and motion in arrest of judgment, the court denied the motions. The court made a finding, on the record, stating:

8

"I thought, under the circumstances, [trial counsel] did a very good job, and I think he also used what he had available. Particularly, what I recall–and I haven't looked at my notes lately, but particularly I recall that he used information he had researched about some of these injuries to cross-examine the Doctor. That's certainly not being unprepared."

The defendant then responded, "I think he did a good job, too, but I think we could have did a better job, is what I–what I ultimately mean to say. He did a good job, but we could have did a better job."

¶ 15    The court found there was sufficient evidence to support the jury's verdict and also denied the motion for new trial filed by the defendant's attorney. The court then heard evidence in aggravation and mitigation. After arguments of counsel regarding sentencing, the court made further statements regarding its opinion of defense counsel's representation of the defendant, as follows, "And contrary to the allegations, I point out, too, [defense counsel], I would compliment you on how you apparently analyzed the case and worked hard to get your points in defense of Mr. Johnson." The defendant was then sentenced to 29 years in prison.

¶ 16    On June 19, 2009, the defendant's trial counsel filed a notice of appeal. Thereafter, on July 7, 2009, a notice of substitution of counsel was filed, and new counsel entered an appearance on behalf of the defendant. Thereafter, this court affirmed the defendant's conviction for aggravated battery of a child. See *People v. Johnson*, No. 5-09-0661 (2010) (unpublished order under Supreme Court Rule 23).

¶ 17    Following his unsuccessful appeal, the defendant, on April 9, 2012, filed a *pro se* postconviction petition pursuant to the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2012)). The defendant also filed an application to sue as a poor person and a motion for appointment of counsel. The allegations set forth in the defendant's April 2012 *pro se* postconviction petition were almost identical to those set forth in his May 12, 2009, *pro se* posttrial motions that had been considered by the trial court in the *Krankel* hearing on May 21, 2009.

¶ 18    On April 23, 2012, without any hearing on the motion, the court appointed counsel for the defendant. The judge who appointed counsel for the defendant was not the trial judge. Several subsequent hearings were scheduled, but the proceedings were delayed for appointment of counsel for the defendant. In the meantime, the defendant filed a *pro se* motion for addendum, seeking to add additional claims to his April 9, 2012, *pro se* postconviction petition. This addendum claimed that the trial court erred in failing to grant the defendant a continuance of his trial and that appellate counsel had rendered ineffective assistance of counsel.

¶ 19    The issue of court-appointed counsel was resolved, and the attorney appointed to represent the defendant then filed additional amendments to the defendant's *pro se* postconviction petition and addendum. In the amended postconviction petition, filed November 30, 2012, postconviction counsel claimed that the defendant's trial counsel was ineffective based upon multiple theories of inadequate investigation, including failure to investigate the defendant's case, failure to "do an in-depth investigation of topics such as acceleration-deceleration theories; and possible causes of the injuries," as

10

well as trial counsel's failure to investigate or call attention to other injuries suffered by the child. Additional allegations included trial counsel's failure to adequately prepare for trial and his inadequate representation of the defendant at trial. Postconviction counsel also claimed that the defendant's appellate counsel failed to raise on appeal the "numerous ineffective acts or non-acts of the defendant's trial counsel in order to set aside the defendant's conviction."

¶ 20    The court attempted on several occasions to set the postconviction petition for an evidentiary hearing. On September 3, 2013, the State filed a motion to dismiss the defendant's postconviction petition. On September 4, 2013, the parties appeared for the evidentiary hearing on the defendant's postconviction motions. This time, the judge who presided over the defendant's trial heard the proceedings. The defendant testified in detail about the following: (1) why he believed it was essential for his trial counsel to have hired an expert witness to counter the evidence the State planned to offer, and the discussions that he and trial counsel had regarding the need for an expert; (2) why it was crucial that trial counsel investigate, as part of his preparation for trial, the medical theories upon which the State's witnesses relied; (3) why trial counsel's investigation needed to include interviewing the State's witnesses; (4) that trial counsel seemed to focus on guilty plea negotiations instead of finding an expert; and (5) the fact that a portion of the fee his family paid to his trial counsel had been paid for the specific purpose of retaining an expert witness who would contest the State's theory of the case. The State cross-examined the defendant regarding (1) the involvement of his parents in the preparation of a medical summary for use by trial counsel and the information

contained in that summary, (2) the fact that the defendant knew an expert had been retained but refused to testify, (3) that his defense counsel had cross-examined Dr. Spivey with the medical records and a journal article, and (4) that the defendant had been presented with several plea agreements. The defendant's mother also testified that part of the payment to trial counsel was for the purpose of hiring an expert witness for the defendant's case.

¶ 21   The defendant's trial counsel failed to appear on September 4 as a result of a misunderstanding as to who was actually responsible for requesting his appearance. Therefore, the hearing was recessed and rescheduled. On October 17, 2013, the evidentiary hearing on the defendant's petition resumed. The defendant's trial counsel testified as an adverse witness. He testified that he was hired by the defendant's parents but denied that he had agreed to use a portion of the attorney fee to hire an expert witness. He acknowledged, however, that "early" in his representation of the defendant, he had attempted to hire an expert witness from Alabama. Trial counsel had used this expert witness several times before, and the expert had indicated he thought he might be of some help. Nevertheless, trial counsel stated that the expert witness declined to become involved because he was "getting pressure from other forensic pathologists." After the Alabama expert witness declined to become involved, trial counsel testified he made no other attempts to hire an expert witness. Trial counsel was not able to remember many specific details related to his representation of the defendant at trial, as he did not have his file or a copy of the trial transcript. He only had "Mr. Johnson's motion and the transcript of the sentencing hearing" that had been sent to him by the defendant's

postconviction counsel. Trial counsel could not remember why he waited to interview Dr. Spivey until three days before the defendant's trial. He could not remember Dr. Leonard's testimony at trial. Finally, trial counsel was unable to remember specifics about what kinds of plea bargains the defendant had been offered by the State. He did recall that the defendant had always maintained his innocence.

¶ 22   On examination by the State, trial counsel indicated he believed that the State had "overcharged" the defendant, alleging matters the State could not prove. In his words, "we thought that would be effective for us in our defense. So when you [the State] struck those charges, that took away from us and that's why I asked for a continuance." Upon reexamination by postconviction counsel, the following exchange occurred:

"Q. (By Mr. Delaney) So you're sort of saying, I think, if I can paraphrase, that by striking some of the charges, it took away some of what you thought would be used to refute the charges that were taken away?

A. Well, not only that, but to show that they basically overcharged and they charged things they couldn't prove.

Q. Which would help convince the jury that he wasn't guilty?

A. Right."

¶ 23   In rebuttal, the defendant's mother again testified that a portion of the fee paid to trial counsel had been paid for the specific purpose of retaining an expert witness who would contest the State's theory of the case. She also testified that when she asked trial counsel about interviewing witnesses and preparing for trial, he "kept saying that he was working on it."

13

¶ 24 Following the evidentiary hearing, the defendant's petition was denied, and the State's motion to dismiss was granted. The trial judge filed a written order on October 22, 2013, and held the defendant had not "demonstrated sufficiently that trial counsel's performance was ineffective or insufficient under *Strickland* standards." The court further held that trial counsel's failure to hire an expert witness "itself is not a failure by counsel" because trial counsel "adequately explained the circumstances and decisions made. There is no showing of the prospect of a different outcome at trial had another been called." Additionally, the trial court held that many of the remaining complaints by the defendant were matters of "[t]rial strategy and tactical decisions" that did not automatically result in questionable assistance of counsel. With regard to the claim that appellate counsel was also ineffective, the trial court found no basis for such a claim.

¶ 25 Thereafter, on November 4, 2013, the defendant filed a *pro se* motion to reconsider the court's denial of his petition. Defendant's postconviction counsel filed a supplemental pleading that included two exhibits: a posttrial letter from the defendant's mother to trial counsel and a 2009 law review article titled, *The Next Innocence Project: Shaken Baby Syndrome and the Criminal Courts*. Deborah Tuerkheimer, *The Next Innocence Project: Shaken Baby Syndrome and the Criminal Courts*, 87 Wash. U. L. Rev. 1 (2009). On December 5, 2013, the court denied the motion to reconsider without comment or analysis, and this timely appeal followed.

¶ 26                                    ANALYSIS

¶ 27 On appeal, the defendant contends that he was not afforded effective assistance of counsel from any of the attorneys appointed to represent him. Specifically, the defendant

argues that the court erred when it denied his postconviction petition that alleged the defendant's "trial attorney was constitutionally ineffective in this alleged shaken-baby case for failing to investigate, timely interview treating physicians, or contact and retain an expert for record review or trial testimony." The defendant also claims the court erred in its denial of the defendant's allegation that his appellate counsel was ineffective for failing to argue, on appeal from the conviction, that trial counsel's representation of the defendant fell below objectively reasonable standards. Finally, the defendant argues that his postconviction counsel was ineffective for failing to properly introduce into evidence the article by Deborah Tuerkheimer, *The Next Innocence Project: Shaken Baby Syndrome and the Criminal Courts*, 87 Wash. U. L. Rev. 1 (2009), thus denying the court the opportunity to hear testimony regarding the significant disagreements in the medical community over "shaken baby syndrome." Alternatively, the defendant urges that this court should remand this matter for further, third-stage postconviction proceedings because the trial court's order made insufficient findings of fact in denying the defendant's petition.

¶ 28    We begin our analysis with certain procedural aspects that materially impact our determination of this case. First, subsequent to his trial in 2009, the defendant filed his own *pro se* posttrial motions, which were heard and denied after a full *Krankel* hearing on May 21, 2009. The essence of the defendant's 2009 *pro se* posttrial motions was a claim of ineffective assistance of counsel. As noted in *People v. Jackson*, "[t]he procedure developed in *Krankel* is intended to fully address a defendant's *pro se* posttrial claims of ineffective assistance of counsel at the trial level, which would serve to

15

potentially limit issues on appeal or, if such issues are raised on appeal, would provide a sufficient record for the reviewing court to consider those claims." *People v. Jackson*, 2016 IL App (1st) 133741, ¶ 69, 50 N.E.3d 66 (citing *People v. Jolly*, 2014 IL 117142, ¶¶ 29, 38, 25 N.E.3d 1127). The transcript of proceedings clearly disclosed that the court was well aware of its responsibilities under *Krankel* and made a preliminary determination that the defendant did not require additional counsel to represent him on his ineffective assistance of trial counsel claims.

¶ 29    "New counsel is not automatically required when a defendant raises a posttrial claim of ineffective assistance of trial counsel." *Jackson*, 2016 IL App (1st) 133741, ¶ 69, 50 N.E.3d 66 (citing *People v. Moore*, 207 Ill. 2d 68, 77, 797 N.E.2d 631, 637 (2003)). Instead, the circuit court must first examine the basis for the defendant's claim, and "[i]f the court determines that the defendant's factual claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion." *Jackson*, 2016 IL App (1st) 133741, ¶ 69, 50 N.E.3d 66 (citing *Moore*, 207 Ill. 2d at 78, 797 N.E.2d at 637). During the *Krankel* hearing, the court spent a considerable amount of time discussing the defendant's allegations. After hearing all of the defendant's arguments, the court determined the defendant's ineffective assistance of counsel claims were without merit and denied his motions. Despite the extensive dialogue between the defendant and the court in pursuit of its responsibilities under *Krankel*, however, the record is devoid of any formal order that memorializes the findings made by the trial court. These findings are contained only in the transcript of proceedings held May 21, 2009. Regardless of whether a formal order was entered, the

16

defendant's *pro se* posttrial motions, as well as the transcript of proceedings prepared in conjunction with the defendant's appeal, clearly revealed the substance of the *Krankel* hearing. All of this information would have been evident to the defendant's appellate counsel.

¶ 30 As noted previously, the defendant filed an appeal from his conviction, which was affirmed by this court on November 9, 2010. In that appeal, the defendant claimed as one of his errors:

> "whether the State failed to prove the required mental state to sustain a conviction for aggravated battery of a child because knowing conduct, rather than reckless conduct, could not be inferred *where the mechanism of injury remained ambiguous*, and thus, the motion for acquittal was denied in error." (Emphasis added.) *People v. Johnson*, No. 5-09-0661, slip order at 3 (2010) (unpublished order under Supreme Court Rule 23).

¶ 31 After our review of the record and our prior disposition, it is abundantly clear that certain matters raised in the defendant's first appeal are mirror images of the many claims he raised in his *pro se* postconviction motions regarding ineffective assistance of counsel. Specifically, the defendant's allegations regarding the lack of proof regarding the mechanism of injury and the prejudice he suffered as a result of his trial counsel's failure to call an expert witness all relate to allegations of error he discussed with the court during the *Krankel* hearing. In other words, both the trial court and this court have already considered many of the allegations related to whether the defendant received a fair trial. As we stated in our prior disposition:

17

"In this case, a rational trier of fact could have properly inferred that the defendant knew or intended that his conduct would cause great bodily harm to the infant. This inference could properly be taken from the wide constellation of injuries to the child, the testimony of the physicians who examined the child, and the defendant's initial account of the incident. The defendant asserts that his intent could not be inferred where the mechanism of the child's injuries is ambiguous, but this assertion is patently false if the statute is interpreted according to its plain meaning. *The actual mechanism of the child's injuries is irrelevant under the statute*, which unambiguously states that the injury may be sustained 'by any means' (720 ILCS 5/12-4.3(a) (West 2008))." (Emphasis added.) *Johnson*, slip order at 11-12.

¶ 32 Assuming, however, for the defendant's benefit, that not all of his allegations were made a part of his appeal from the conviction, they were certainly a part of the record, and could have been the basis for that appeal. "A proceeding under the Post-Conviction Hearing Act does not constitute an appeal. Rather, the Act permits a defendant to mount a collateral attack on his conviction and sentence based on violations of his constitutional rights. [Citations.] *** Accordingly, determinations of the reviewing court on direct appeal are *res judicata* as to issues actually decided and issues actually that could have been raised on direct appeal but were not are waived. [Citations.]" *People v. Coleman*, 168 Ill. 2d 509, 522, 600 N.E.2d 919, 927 (1995). Therefore, the defendant's postconviction claims regarding trial counsel's ineffective assistance of counsel should

18

have been dismissed under the doctrine of *res judicata* and forfeiture. *People v. Blair*, 215 Ill. 2d 427, 831 N.E.2d 604 (2005).

¶ 33 The conundrum we face in this appeal is that the defendant's postconviction petition was not dismissed. Instead, he was afforded a second judicial forum in which to voice, once again, his claims of ineffective assistance of counsel. The trial court allowed the defendant an evidentiary hearing under the Act (725 ILCS 5/122-1 *et seq.* (West 2012)). Normally, only when a defendant makes a substantial showing of a constitutional violation does the petition advance to the third stage, where the trial court conducts an evidentiary hearing. 725 ILCS 5/122-6 (West 2012); see also *People v. Edwards*, 197 Ill. 2d 239, 246, 757 N.E.2d 442, 446 (2001).

¶ 34 Here, the defendant filed a *pro se* postconviction motion and a motion for the appointment of counsel almost 1½ years after this court issued its disposition affirming the defendant's conviction. The record does not reveal why the court appointed counsel for the defendant. There is no transcript and no order indicating that the court ever considered the defendant's postconviction motion under the first or second stage of the Act. The judge who entered the order appointing counsel was not the trial judge. There was no written order in the court file that indicated a *Krankel* hearing had occurred. Likewise, there were no written findings made in the court file. Therefore, it is reasonable to assume that the judge who was unfamiliar with the trial proceedings simply granted the defendant's motion for court-appointed counsel, without requiring the defendant to make any of the showings required under either the first or the second stage of the Act. Thus, by the time the trial judge scheduled the evidentiary hearing, the defendant was the

19

beneficiary of being able to present his claims, once again, in the form of a third-stage evidentiary hearing.

¶ 35 At this third stage, the defendant had the burden of showing that he had "suffered a substantial deprivation of his federal or state constitutional rights in the proceedings that produced the conviction or sentence being challenged." *People v. Pendleton*, 223 Ill. 2d 458, 471, 861 N.E.2d 999, 1007 (2006). In our view, the court held a hearing on claims that were already barred by the doctrines of *res judicata* and forfeiture.

¶ 36 Nevertheless, the defendant urges that the doctrines of forfeiture and *res judicata* should not bar his claims, as he has also alleged that appellate counsel was ineffective for failing to raise the defendant's allegations that he was denied his sixth amendment right to effective assistance of trial counsel. It is true that the defendant is guaranteed effective assistance of counsel on appeal from a conviction, and our supreme court has held "that the doctrine of waiver should not bar consideration of an issue where the alleged waiver stems from incompetency of counsel on appeal." *People v. Coleman*, 168 Ill. 2d 509, 522-23, 660 N.E.2d 919, 927 (1995).

¶ 37 Claims of ineffective assistance of appellate counsel are measured against the same standard as those dealing with the ineffective assistance of trial counsel. *People v. Coleman*, 168 Ill. 2d 509, 523, 660 N.E.2d 919, 927 (1995); *People v. Foster*, 168 Ill. 2d 465, 474-75, 660 N.E.2d 951, 955-56 (1995). The trial court's order made a specific finding that defendant had not been prejudiced "under *Strickland* standards." To succeed on a claim of ineffective assistance of counsel under the *Strickland* standard, a defendant must show that counsel's performance fell below an objective standard of reasonableness

20

and that counsel's deficient performance resulted in prejudice. *People v. Ross*, 229 Ill. 2d 255, 260, 891 N.E.2d 865, 869 (2008); *People v. Shaw*, 186 Ill. 2d 301, 332, 713 N.E.2d 1161, 1177 (1998). "Because a defendant must establish both a deficiency in counsel's performance and prejudice resulting from the alleged deficiency, failure to establish either proposition will be fatal to the claim." *People v. Sanchez*, 169 Ill. 2d 472, 487, 662 N.E.2d 1199, 1208 (1996).

¶ 38    Therefore, in order to examine whether the defendant was denied effective assistance of appellate counsel, we examine the merits of the issues that could have been raised on direct review as they relate to the defendant's allegations of ineffective assistance of trial counsel, thus providing the defendant with the proverbial "second bite at the apple." This circuitous route, then, has brought us back to considering the defendant's contentions that his trial counsel was ineffective. We have reviewed the entire record of proceedings, including the *Krankel* hearing and the trial court's two-day evidentiary hearing held September 4 and October 17, 2013. Our conclusions based upon our review of the record are identical with those findings made by the trial court. The defendant has repeatedly, through verbose postconviction pleadings, made the same complaints as in his posttrial motions−that he was denied a fair trial because the mechanism of injury to his son was in dispute and he was never allowed to adequately present this issue in defense of the charge of aggravated battery of a child. During the third-stage hearing, the defendant testified repeatedly that he was prejudiced because his trial counsel did not hire an expert witness to refute the cause of injuries to his son. He admitted, however, that he was given access to all of the medical records and could have

21

reviewed them. He acknowledged that his parents were also given access to the medical records, created a summary of the records, and even prepared questions for trial counsel to ask. The defendant's trial counsel indicated that he asked some of the questions given to him and cross-examined one of the physician experts with a medical journal. In the record before us, as a part of the exhibits introduced at this hearing, defendant submitted a journal article pertaining to "shaken baby syndrome." While there was no evidence offered at the postconviction hearing on the significance of this article as it related to the defendant's theory of his innocence, this issue was clearly resolved by this court during the appeal, *i.e.*, *the mechanism of the injury was irrelevant*. *People v. Johnson*, No. 5-09-0661 (2010) (unpublished order under Supreme Court Rule 23). Moreover, contrary to the defendant's claims, trial counsel testified that he attempted to obtain an expert but was unable to do so. It is clear that trial counsel spent a great deal of effort reviewing the medical records and conducted a thorough and effective cross-examination of the physicians. Although the State never required trial counsel to disclose the name of the medical article used to cross-examine Dr. Spivey, it is also clear that the statement trial counsel pulled from that article was helpful to the defendant. The trial court, on two separate occasions, found trial counsel to have done the best job he could in defending the case. Even the defendant, during the *Krankel* hearing, conceded his trial counsel had done a "good job." We agree.

¶ 39 Subsequent to the full, third-stage evidentiary hearing under the Act, the court held the defendant had failed to carry his burden of proof "under *Strickland* standards." There is simply no evidence that the defendant was denied effective assistance of counsel at any

22

level. The defendant's postconviction claim of ineffective assistance of appellate counsel was properly denied by the trial court.

¶ 40 We have reviewed the entire record and considered the multitudes of the defendant's claims set forth in his many petitions and addendums, as well as relevant case law. We find that the circuit court's dismissal of the defendant's petition for postconviction relief was proper.

¶ 41 Affirmed.

2016 IL App (5th) 130554

NO. 5-13-0554

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 07-CF-211 |
| | ) | |
| BRANDON JOHNSON, | ) | Honorable |
| | ) | James Hackett, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

**Opinion Filed:**      September 7, 2016

_____

**Justices:**      Honorable Judy L. Cates, J.,

Honorable S. Gene Schwarm, P.J., and
Honorable James R. Moore, J.,
Concur

_____

**Attorneys for Appellant**      Michael J. Pelletier, State Appellate Defender, Jacqueline L. Bullard, Deputy Defender, Daaron V. Kimmel, Assistant Appellate Defender, Office of the State Appellate Defender, Fourth Judicial District, 400 West Monroe Street, Suite 303, P.O. Box 5240, Springfield, IL 62705-5240

_____

**Attorneys for Appellee**      Hon. Thomas D. Gibbons, State's Attorney, Madison County Courthouse, 157 North Main Street, Suite 402, Edwardsville, IL 62025; Patrick Delfino, Director, David J. Robinson, Acting Deputy Director, Sharon Shanahan, Staff Attorney, Office of the State's Attorneys Appellate Prosecutor, 730 East Illinois Highway 15, Suite 2, P.O. Box 2249, Mt. Vernon, IL 62864

_____