NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

2020 IL App (4th) 180069-U

NO. 4-18-0069

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
August 5, 2020
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Champaign County |
| KYDEL J. BROWN, | ) | No. 17CF479 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Thomas J. Difanis, |
| | ) | Judge Presiding. |

JUSTICE HOLDER WHITE delivered the judgment of the court.
Justices Turner and DeArmond concurred in the judgment.

**ORDER**

¶ 1    *Held*: The appellate court reversed and remanded where the trial court failed to conduct a neutral and nonadversarial *Krankel* inquiry.

¶ 2    Following an August 2017 jury trial, defendant, Kydel J. Brown, was found guilty of armed robbery (720 ILCS 5/18-2(a)(2) (West 2016)), a Class X felony. On September 12, 2017, the trial court received a letter from defendant alleging ineffective assistance of trial counsel. On September 21, 2017, defendant's trial counsel filed a response to defendant's correspondence, arguing the trial court should conduct an inquiry into defendant's allegations pursuant to *People v. Krankel*, 102 Ill. 2d 181, 464 N.E.2d 1045 (1984).

¶ 3    On October 5, 2017, pursuant to *Krankel*, the trial court conducted an inquiry into defendant's allegations of ineffective assistance of trial counsel. Following the hearing, the court

declined to appoint new counsel to investigate defendant's allegations. On October 10, 2017, the court sentenced defendant to 38 years in prison.

¶ 4        Defendant appeals, arguing the trial court (1) failed to conduct a nonadversarial inquiry under *Krankel* because it did not allow defendant an opportunity to clarify his claims and (2) abused its discretion in sentencing him to 38 years in prison. We reverse and remand for further proceedings.

¶ 5                                I. BACKGROUND

¶ 6        Because defendant does not challenge the sufficiency of the evidence leading to his conviction, we recite only those facts providing the necessary context to resolve the issues presented in this appeal.

¶ 7                        A. The Charges and Jury Trial

¶ 8        On April 13, 2017, the State charged defendant by information with one count of armed robbery (720 ILCS 5/18-2(a)(2) (West 2016)), a Class X felony. The information alleged that on July 26, 2016, defendant "took property, being U.S. Currency and tobacco products, from the presence of Laurie Morris by the threat of the imminent use of force, and [defendant], or one for whose conduct he is legally responsible, carried on or about his person a firearm, namely a handgun."

¶ 9        Over the course of a four-day jury trial in August 2017, the following evidence was presented.

¶ 10                        1. *State's Case-in-Chief*

¶ 11                            a. Laurie Morris

¶ 12        Laurie Morris testified that on July 26, 2016, she was working the overnight shift as a cashier at the Shell gas station located at 1812 North Cunningham in Urbana, Illinois. Morris

testified that around 12:50 a.m., two masked individuals entered the Shell, one of whom held a silver revolver that he pointed at her. The individual with the silver revolver led her over to the cash register while the other individual took cigarettes from behind the register and placed them in a backpack and a garbage bag. After Morris opened the register, the individual with the handgun ordered Morris to lay on the ground and then proceeded to take all of the paper money from the cash register. A recording from the Shell surveillance camera was admitted into evidence and played for the jury.

¶ 13     After the two individuals left the Shell, Morris locked the doors and called the police. As Morris locked the doors, she saw the individuals enter a vehicle in the Motel 6 parking lot, which was next door to the Shell. Morris described the vehicle as a beige or tan four-door Buick. Morris testified that there was a third individual in the Buick, who appeared to have been waiting for the two individuals while they were inside the Shell station.

¶ 14                          b. Tierykah Wiley

¶ 15     Tierykah Wiley testified she was not familiar with either the Shell gas station or the Motel 6 located on North Cunningham Avenue in Urbana, Illinois. She was not familiar with either defendant or an individual named Kelvin Hartfield. She did not recall testifying previously in a related case. The State then requested that Wiley be treated as a hostile witness and the court allowed the State to proceed with cross-examination.

¶ 16     Wiley testified she did not recall being in a tan Buick with defendant and Hartfield on the evening of July 25, 2016, or the early morning hours of July 26, 2016. She did not recall any of the following: (1) going to the Motel 6 or Shell gas station on North Cunningham Avenue with defendant and Hartfield, (2) that defendant and Hartfield went into the Shell station and returned with bags full of cigarettes, (3) going to 54 Michelle Lane in Urbana

with defendant and Hartfield where defendant's mother lived and defendant entering the residence, (4) entering a red Hyundai Elantra outside the residence while Hartfield attempted to transfer bags of cigarettes from the Buick into the Elantra, or (5) police officers arriving at the residence and gunfire being exchanged.

¶ 17                                   c. Deputy Joshua Demko

¶ 18          Champaign County Sheriff's Office (CCSO) Deputy Joshua Demko testified that on July 26, 2016, he received a radio report of a tan four-door Buick involved in a robbery. At 1:14 a.m., he saw a car matching that description pull into a parking spot in a trailer park off of University Avenue in Urbana; he was about 300 feet away from the tan Buick and observed a person walk away from the car's passenger side. He reported his observations over his radio and after several minutes, Deputies Derouchie, Casey Donovan, and Richard Ferriman arrived. Upon their arrival, Officers Donovan and Ferriman shined their flashlights into a maroon Hyundai Elantra that was parked next to the Buick and announced themselves while Demko approached the driver's side of the car. A man exited the vehicle and fled, firing a revolver in the direction of the deputies.

¶ 19                                   d. Deputy Donovan

¶ 20          CCSO Deputy Casey Donovan gave an account similar to that of Demko, adding that he and Deputy Derouchie removed a woman from the back of the red car, which he identified as a maroon Hyundai Elantra. Deputy Donovan testified he handcuffed the woman and identified her as Tierykah Wiley.

¶ 21                                   e. Susan Chapin

¶ 22          Pursuant to section 115-10.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-10.1 (West 2016)), the trial court allowed Susan Chapin, an employee of the

Champaign County State's Attorney's Office, to read into evidence several excerpts from a transcript of the testimony of Tierykah Wiley from the jury trial of Kelvin Hartfield, which occurred on March 7, 2017. Ms. Chapin read that Wiley previously testified on July 26, 2016, that defendant picked her up from the Motel 6 while Hartfield sat in the passenger's seat. Wiley believed the car belonged to defendant. Defendant drove to the Shell station where he and Hartfield exited the vehicle and quickly returned with bags and drove away. The three of them stopped to switch cars at a residence, where defendant went inside and Hartfield began to transfer the bags from the first car into a second, maroon car. At some point, police officers arrived, Wiley heard gunfire, and she was arrested.

¶ 23                                  f. Forensic Evidence

¶ 24        University of Illinois Police Department Detective Anthony Carpenter testified he executed a search warrant at 54 Michelle Lane and found two sets of car keys in a drawer in the south bedroom, one of which was given to CCSO Investigator David Sherrick, who used the keys to unlock the tan Buick. CCSO Investigator Chad Carlson testified the tan Buick was registered to Kathy Barker and the maroon Hyundai Elantra was registered to Joanna Wilson.

¶ 25        Illinois State Police (ISP) crime scene investigator Tim Lemasters testified he searched the Hyundai Elantra belonging to Wilson, recovering latent fingerprints as well as a series of objects including: a Samsung mobile phone, two backpacks, a trash bag, a red T-shirt and a white T-shirt, cartons of Newport cigarettes, cigarillos, and personal property appearing to belong to defendant and Hartfield. Lemasters testified he obtained fingerprint standards from defendant and sent them to the Illinois State Police crime laboratory.

¶ 26        ISP fingerprint examiner Kevin Horath testified he compared latent fingerprints from the Hyundai to standards obtained by Lemasters and found the print obtained from the

Samsung mobile phone matched that of defendant. ISP forensic scientist Amanda Humke testified she cut a portion of a white stain on the red T-shirt obtained from the Hyundai and prepared it for further analysis. ISP forensic scientist Rhonda Carter testified she obtained deoxyribonucleic acid (DNA) profiles from the red T-shirt sample and buccal swabs from defendant and an individual named Marcus Craig; Craig's profile was excluded, but the profile matched that of defendant.

¶ 27                              2. *Defendant's Case-in-Chief*

¶ 28        Defendant presented the testimony of two witnesses: his girlfriend, Joanna Wilson, and his mother, Dionishia Terry.

¶ 29        Wilson testified that on July 25, 2016, defendant was at her house, but she dropped him off in her Hyundai Elantra at Terry's around 8 or 9 p.m. Later that evening, sometime between 9 and 10 p.m., Wiley came to Wilson's home where Wilson gave Wiley the keys to her car, asking Wiley to pick defendant up at Terry's house.

¶ 30        Dionishia Terry testified she was friends with Kathy Barker and that she had Barker's tan Buick and its keys in her possession on July 25, 2016. She knew Wilson through defendant, and Wiley through Wilson. On July 25, 2016, Terry was at her mobile home at 54 Michelle Lane with defendant, Marcus Craig, Shantell Terry, Vanishia Hunt, Inece Hunt, Vashti Dodd, Veaon Hunt, Sheree Harris, Tyshon Craig, and Tee Palmer. At some point, Terry went to a nearby McDonald's with Marcus Craig, and defendant was home when she returned around 10 p.m. Terry testified she did defendant's laundry, watched TV, and socialized with the people in the house. Terry did not leave the house after returning from McDonald's or prior to hearing gunfire outside. She testified defendant and Marcus Craig did not leave the house either. Terry testified the Shell gas station on North Cunningham Avenue was about a five- to seven-minute

drive from her home. Terry denied telling CCSO Investigator Carlson that defendant arrived at her home shortly before the shooting but was impeached with her recorded statement to that effect, made to Carlson around 7:30 a.m. on July 26, 2016.

¶ 31    At the conclusion of trial, the jury found defendant guilty of armed robbery.

¶ 32                    B. *Krankel* Proceedings

¶ 33    Prior to sentencing, defendant *pro se* sent a letter to the trial court stating the following:

"Dear Honorable Judge Difanis,

I am writing you [to] let you know that I found my attorney being an effective assistant of counsel due to her not filing a motion for limine excluding all uncharged crimes and excluding all evidence of uncharged crimes. She has also failed [to] call 5 witness[es] on my behalf: Kelvin Hartfield, Vanishia Hunt, Veaon Hunt, Kathy Barker, and Marcus Craig. [Trial counsel] did not object [to] Susan Chapin testifying on behalf of Ti[e]rycka[h] Wiley.

Kelvin Hartfield: Could have testified I was not an accomplice of the charged and uncharged crimes.

Kathy Barker: Could testify she has rightful ownership of the Tan Buick that was allegedly used in this crime.

Vanishia Hunt: Could testify on the behalf of my alibi placing me at home from 11:00 p.m. until I was taken [to] the police station.

Veaon Hunt: Could place me at home during the time 11:00 p.m. until I was taken [to] the Police station.

- 7 -

Marcus Craig: Could place me home during 11:00 p.m. until the time I was taken [to] the Police station.

[Trial counsel] did not send an officer nor private investigator to follow up with my witness[es] for my alibi.

This is the importance of these witness[es] she failed [to] call on my behalf."

¶ 34 On September 14, 2017, defendant's trial counsel filed a motion for acquittal or, in the alternative, new trial. On September 21, 2017, trial counsel filed a response to defendant's letter to the trial court. In her response, trial counsel asserted that because defendant raised *pro se* claims of ineffective assistance of counsel, "[i]t would be proper for this Court to conduct a hearing under *People v. Krankel*, 102 Ill 2d. 181 (1984) to conduct a preliminary inquiry into the factual basis behind [defendant's] claims."

¶ 35 Trial counsel then addressed each of defendant's allegations of ineffective assistance of counsel as follows:

"a. She failed to file a Motion in Limine regarding uncharged conduct. There was a Motion in Limine filed. The Motion was denied in part and granted in part (see Exhibit B).

b. She allowed Susan Chapin to testify on behalf of Tierykah Wiley. This is not reflected in the proceedings. Ms. Chapin did not testify on behalf of Tierykah Wiley. Ms. Chapin was used to read the trial testimony from the trial of Kelvin Hartfield on March 7, 2017 as impeachment for Ms. Wiley's testimony on August 15, 2017.

c. She failed to call Kelvin Hartfield as a witness at trial to deny [defendant] was an accomplice to charged and uncharged crime. This was a matter of trial strategy. Mr. Hartfield was convicted in [Champaign County case No.] 16-CF-1055 and received a sentence of 90 years. Mr. Hartfield maintained his own innocence throughout his trial and sentencing. As a trial strategy, [defense counsel] believed that this would reflect that Mr. Hartfield would not testify about events that he claimed not to be at himself.

d. She failed to call Kathy Barker. The ownership of the tan Buick was not at issue at trial. Ms. Dionishia Terry, mother of [defendant], testified that she was in possession of the tan Buick as a vehicle for her personal use. Investigator Anthony Carpenter testified that he found keys to the tan Buick in the south bedroom of 54 Michelle Lane. Additionally, Steve Guess, Investigator for the Champaign County Public Defender, interviewed Kathy Barker and found out there was only one set of keys to the tan Buick and those keys were in the sole possession of Dionishia Terry. As a trial strategy, [defense counsel] did not call Kathy Barker because her testimony only would support the theory of the case that someone at 54 Michelle Lane was the only person with access to the car keys.

e. She failed to call Vanishia Hunt to serve as an alibi. Ms. Hunt gave a statement to police the morning after the incidents occurred in which she stated that she got off work at 9:00 p.m. and arrived home at l0:30 p.m. Ms. Hunt stated that she went to bed shortly after arriving home and everyone, including [defendant] was still up in the residence. Ms. Hunt also said it was possible that

someone could have left the residence during the overnight hours of 7-25-16 and 7-26-16 without her knowing (see Exhibit C). Ineffective assistance of counsel claims are reviewed pursuant to the standards set forth in *Strickland v. Washington*. In order to prove ineffective assistance, defendant must show that his counsel's performance was deficient and that he was prejudiced by counsel's deficient performance. *People v. Campbell*, 37 N.E.3d 891, 902 (2015). Failure to demonstrate prejudice defeats defendant's claim of ineffective assistance of counsel. *Id.* at 902. Since the alibi testimony was presented at trial, defendant was not prejudiced by counsel's omission and his claim of ineffective assistance must fail. *Id.* at 902. In this case, alibi testimony was presented through Dionishia Terry. In *Campbell*, Defendant also contended that his counsel was ineffective for failing to present witnesses whose testimony would have supported his defense. However, as the trial court noted, neither witness definitively testified that defendant was not involved in the crime so the Court did not see how this evidence would have helped defendant's case in light of strong identification testimony and other corroborating evidence. This is analogous to the case of [defendant].

f. She failed to call Ve[a]on Hunt to serve as an alibi. Mr. Hunt currently is incarcerated in the Illinois Department of Juvenile Justice on an unrelated matter. Mr. Hunt gave a statement to police the morning after the incidents occurred that was inconsistent throughout the statement (see Exhibit D). Additionally, in part of his statement, Ve[a]on Hunt indicated that [defendant] was in the south bedroom with him. This is the same bedroom where Investigator

- 10 -

Carpenter found the keys to the tan Buick that was allegedly used during the Circle K [*sic*] robbery. This would have put [defendant] in the room with the keys. Ineffective assistance of counsel claims are reviewed pursuant to the standards set forth in *Strickland v. Washington*. In order to prove ineffective assistance, defendant must show that his counsel's performance was deficient and that he was prejudiced by counsel's deficient performance. *People v. Campbell*, 37 N.E.3d 891, 902 (2015). Failure to demonstrate prejudice defeats defendant's claim of ineffective assistance of counsel. *Id.* at 902. Since the alibi testimony was presented at trial, defendant was not prejudiced by counsel's omission and his claim of ineffective assistance must fail. *Id.* at 902. In this case, alibi testimony was presented through Dionishia Terry. In *Campbell*, Defendant also contended that his counsel was ineffective for failing to present witnesses whose testimony would have supported his defense. However, as the trial court noted, neither witness definitively testified that defendant was not involved in the crime so the Court did not see how this evidence would have helped defendant's case in light of strong identification testimony and other corroborating evidence. This is analogous to the case of [defendant].

g. She failed to call Marcus Craig to serve as an alibi. Mr. Craig gave a statement on July 26, 2016. In this statement, Mr. Craig said that he was not going to say anything about [defendant] and didn't know the times [defendant] was at home or gone from the residence (Exhibit E). Additionally, Mr. Craig gave a statement on October 11, 2016. In this statement, Mr. Craig said that Tierykah Wiley was in the vehicle when the shooting happened and that Kelvin

Hartfield did the shooting. Mr. Craig said he did see [defendant] in the trailer just before the shooting. Mr. Craig also said that he knew Kelvin Hartfield through Marcus Craig (Exhibit F). Ineffective assistance of counsel claims are reviewed pursuant to the standards set forth in *Strickland v. Washington*. In order to prove ineffective assistance, defendant must show that his counsel's performance was deficient and that he was prejudiced by counsel's deficient performance. *People v. Campbell*, 37 N.E.3d 891, 902 (2015). Failure to demonstrate prejudice defeats defendant's claim of ineffective assistance of counsel. *Id.* at 902. Since the alibi testimony was presented at trial, defendant was not prejudiced by counsel's omission and his claim of ineffective assistance must fail. *Id.* at 902. In this case, alibi testimony was presented through Dionishia Terry. In *Campbell*, Defendant also contended that his counsel was ineffective for failing to present witnesses whose testimony would have supported his defense. However, as the trial court noted, neither witness definitively testified that defendant was not involved in the crime so the Court did not see how this evidence would have helped defendant's case in light of strong identification testimony and other corroborating evidence. This is analogous to the case of [defendant]. Furthermore, the trial strategy by [trial counsel] was to avoid any close ties between Mr. Hartfield and [defendant] and Mr. Craig corroborated the relationship between Mr. Hartfield and [defendant].

h. Finally, [defendant] alleges that [trial counsel] did not send the private investigator out to talk to witnesses. The private investigator for Champaign County Public Defender's Office Steve Guess conducted interviews on

September 12, 2016 with Dionishia Terry. Steve Guess also met with [defendant] along with [trial counsel] on August 9, 2017. At this time, [defendant] indicated that he really did not want us to call any particular witnesses on his behalf."

¶ 36    At the conclusion of the response, trial counsel again requested, on defendant's behalf, that the trial court "conduct a *Krankel* hearing" and "that the Court make a ruling as to whether [trial counsel] should continue as counsel of record for post-trial matters and sentencing hearing."

¶ 37    On October 5, 2017, the trial court conducted a preliminary *Krankel* inquiry. Neither defendant nor his trial counsel spoke at the hearing and the trial court did not ask defendant or his trial counsel any questions. The court addressed defendant's factual allegations as follows:

"[Defendant], in looking at what you filed, there was some issue of excluding uncharged crimes, and excluding evidence of uncharged crimes, and that she failed to call witnesses on your behalf, and you listed those witnesses, and that you didn't object to Susan Chapin testifying on behalf of Tierykah Wiley.

First of all, Ms. Chapin didn't testify on behalf of Ms. Wiley, she merely read a transcript. Anybody could have read that. The court determined that I wasn't going to read it. It could have been anybody, and then Ms. Chapin seemed to be an appropriate person, so that's not even close to being an error.

You indicated that Ms. Barker would have testified that she was the rightful owner of the Buick in question. Ownership wasn't an issue, possession was, and there's a substantial difference between ownership and possession. She owned the vehicle, but someone else had possession of it, namely the woman who

- 13 -

was residing at the residence. The Buick was found outside the residence, and the keys were in the bedroom.

Ms. Hunt, you indicated could have testified that, concerning an alibi placing you at home from 7 p.m. until you were taken into custody. Now according to the public defender in their response, Ms. Hunt gave a statement to the police the morning after the incident, and she said that she got off work at nine p.m., arrived home at 10:30, she went to bed shortly thereafter, and everyone, including yourself, was still up in the residence. She also said it was possible that someone could have left the residence during the overnight hours without her knowing it. So had she been called as a witness, she could have verified, as other witnesses did, other alibi witnesses, that you were present in the residence, but she could not account for your presence during the actual entire time in question, because she had made a statement to the police that would have been used in the trial, should she have testified.

Now you also indicate that Veaon Hunt would have placed you at home, 11 p.m. until I was taken into the police station, and Mr. Hunt is incarcerated in the Juvenile Department of Justice on an unrelated matter. He gave a statement to the police that was inconsistent with the statement. Additionally in part of his statement he indicated that you were in the south bedroom with him, and this is the same bedroom where the keys to the Buick were found. So had that person been called as a witness, that would have verified the fact that you were in the same bedroom where the keys to the Buick were found.

- 14 -

That's—that's a determination that's a—a trial strategy determination, whether or not that evidence would have been more beneficial to you than not, and since there was already the alibi witnesses called, there doesn't appear to have been a problem with not calling that person. Again, not only that, but that person would have come in from the Department of Juvenile Justice, obviously in custody, and that also would have tested his credibility.

Now Marcus Craig could have placed you at home. He gave a statement to the police also, according to the public defender's response, that he was not going to say anything about you and didn't know the times you were at home or gone from the residence.

So again, had he been called to testify, and had he testified contrary to what he told the police, then his statement to the police would have come in to challenge his credibility, and again, there was alibi witnesses that— there were alibi witnesses that were called.

You've indicated that the public defender did not send an officer, nor private investigator to follow up with my witnesses for my alibi. According to the public defender, the private investigator for Champaign County Public Defender's Office conducted interviews on September 12 with Dionishia Terry. They met with Mr. Guess—met with you, along with [trial counsel], on August 9 of 2017, and at that time you indicated that you really did not want us—namely the PD's office—to call any particular witnesses on your behalf.

Based upon what the court viewed during the course of the trial, based upon your complaints, based upon the public defender's understanding of those

complaints—and under normal circumstances I would be asking [trial counsel] to answer those questions, it's not necessary because she has provided written answers to those questions—this isn't a—an issue where there was in any way, shape, or form ineffective assistance of counsel.

So the request in the *Krankel* hearing, the court's made a determination that there was not ineffective assistance of counsel."

¶ 38                              C. Posttrial Motions and Sentencing

¶ 39        The trial court conducted a hearing October 10, 2017. After denying defendant's posttrial motion for acquittal, or in the alternative, a new trial, the court proceeded with sentencing.

¶ 40                              1. *Evidence and Arguments*

¶ 41        As evidence in aggravation, the State presented testimony from Investigator Norman J. Meeker from the Champaign County Sheriff's Department. Meeker testified that over the course of his investigation in this case, he obtained a video from defendant's mobile phone, dated several weeks before the armed robbery, depicting defendant with two firearms. The State played the video for the court and it was admitted into evidence. Meeker testified that one of the firearms depicted in the video was a small revolver that resembled the one recovered during the investigation of the case and was alleged to have been used during the armed robbery. In performing a firearms trace, Meeker discovered the revolver was originally sold to an individual named Craig Antoline. When Meeker contacted Antoline about the revolver, he was not aware that it was missing. Antoline did not know how the revolver went missing. Antoline informed Meeker that he kept the revolver in the glove compartment of his car, that he sometimes gave rides to people he met at his job at Planned Parenthood, and that occasionally he leaves those

- 16 -

people in the car while he goes to the convenience store. Finally, Meeker testified that although the revolver depicted in defendant's video bore a "striking resemblance" to the one recovered in the investigation of this case, he did not discover anything "directly connect[ing] *** defendant to the actual theft of the firearm" and could not "place *** defendant as the actual thief of that firearm."

¶ 42   In mitigation, defendant presented the testimony of his mother, Dionishia Terry. Terry testified defendant was only 24 years old and a father, and that a long prison sentence would present a great hardship on defendant's family. Terry believed she and her family offered defendant a positive support system.

¶ 43   During argument, the State emphasized defendant's past criminal history, which included a juvenile adjudication for battery in 2006 and a Class 1 burglary conviction in 2010. In each case, defendant received probation that was later revoked, resulting in sentences to the Illinois Department of Juvenile Justice and the Illinois Department of Corrections, respectively. The State also noted defendant was convicted for robbery in 2010 and received a later conviction for unlawful possession of a weapon by a felon. The State argued there was ample evidence the armed robbery was planned well in advance and it was "not a spur of the moment thing." The State further emphasized the violent nature of the offense, stating, "I'm sure the court remembers the video and the stills from the trial where they take someone; in this case, Laurie Morris, who is simply trying to do her job in the early morning hours, and they put her at gunpoint on the floor with a loaded weapon pointed directly at her." Additionally, the State argued this was not a case where defendant "was driven to his actions by an addiction" or desperation; defendant and his accomplice stole the cigarettes for the purpose of resale. The State recommended a sentence of 42 years in prison.

- 17 -

¶ 44    Defendant's attorney argued for the minimum sentence of 21 years in prison, emphasizing defendant was a father of three and had expressed a desire to be present in their lives. Defendant's attorney noted defendant was "very young, and so to sentence him to an exceedingly large number of years in the Department of Corrections could be an injustice that we don't want have happen." Defendant additionally gave a statement in allocution, apologizing to his family and requesting a furlough of 24 to 48 hours to spend with his family before beginning his prison sentence.

¶ 45                          2. *Trial Court's Sentence*

¶ 46    At the conclusion of arguments, the trial court stated the following:

> "Well, I have considered the report prepared by Court Services. I have considered the comments of counsel and the comments of *** defendant. I have considered the testimony on behalf of *** defendant, as well as the letters submitted on his behalf. I have considered the testimony presented by the prosecution.

> I have considered the statutory factors in aggravation as well as the statutory factors in mitigation. There aren't any statutory mitigating factors that apply to *** defendant to this type of an offense. There is some mitigation in this record. He's only twenty-four years of age. That in and of itself is a nonstatutory mitigating factor. One—given a person that age, one would hope that there is mitigation—rehabilitation potential in his life, so again he's only twenty-four years of age, and that is a nonstatutory mitigating factor.

The two statutory factors in aggravation, we have *** defendant's prior criminal history. This is his fourth felony conviction plus one juvenile adjudication, so that prior criminal history is a statutory factor in aggravation.

The other statutory factor in aggravation is the deterrent factor. This court has to fashion a sentence that will not only deter [defendant] but other individuals similarly situated from committing this type of an offense. This was an armed robbery. The court reviewed the video of the offense. Chilling. The clerk is placed face down on the floor with a gun pointed at her as a cash drawer is emptied and *** defendant is collecting the cigarettes. So the deterrent factor has to come across loudly and clearly.

The majority of armed robberies in this court's experience committed by individuals who have some form of an addiction, they need to steal to support their habit. Sometimes they take it to the extreme using a firearm. Based upon the evidence that was presented in this case, that doesn't appear to be the circumstances surrounding this type of an offense. This was an offense that was planned out right down to the amount of money the cigarette packages were going to be sold for—I believe it was five dollars a pack—and then *** defendant and his co-defendant executed their plan. They went in and committed their armed robbery. So to the extent that this one was carried out with a great deal of planning is a deterrable offense. We're not dealing with an addict who doesn't believe he or she can survive without stealing money to support their habit. This was a crime of violence committed so that *** defendant and his co-defendant could get money.

The sentencing range is minimum twenty-one years and a maximum forty-five years. In determining that range, the court has to consider the circumstances surrounding the offense, as the court has indicated. The history, character, and condition of the defendant. We have here a young man who has been adjudicated a delinquent minor back in '06, was convicted of a Class 1 felony in 2010, convicted of a robbery conviction in 2010, convicted of unlawful possession of a weapon in 2012. So we have here a young man who hasn't really made mistakes; he commits serious felony offenses.

The video that was played in court today again is somewhat chilling, and we have the request and the concern that his children he has brought into the world, that he is unable to support because of his lack of education and lack of employment, that they are going to be at a loss if he is committed to the Department of Corrections. That video is again an indication of the history, character, and condition of *** defendant.

When the court considers all of the factors, and especially, especially the deterrent factor, I believe an appropriate sentence will be one of incarceration to the Illinois Department of Corrections. It will be for a period of thirty-eight years."

¶ 47     In November 2017, defendant filed a motion to reconsider his sentence, arguing the trial court gave improper weight to his prior criminal history and the deterrent factor in fashioning the sentence. Following a hearing on January 23, 2018, the trial court denied the motion.

¶ 48     This appeal followed.

¶ 49                                    II. ANALYSIS

¶ 50        On appeal, defendant argues the trial court (1) failed to conduct a nonadversarial

hearing on defendant's *pro se* allegations of ineffective assistance of counsel in violation of

*Krankel* and (2) abused its discretion when it sentenced defendant to 38 years in prison.

¶ 51                          A. The Preliminary *Krankel* Inquiry

¶ 52                                  1. *General Principles*

¶ 53        When confronted with a defendant's posttrial allegations of ineffective assistance

of counsel, our supreme court set out the procedural steps to follow in *People v. Moore*, 207 Ill.

2d 68, 77-78, 797 N.E.2d 631, 637 (2003) (noting the rule that had developed since *Krankel*):

> "New counsel is not automatically required in every case in which a defendant
>
> presents a *pro se* posttrial motion alleging ineffective assistance of counsel.
>
> Rather, when a defendant presents a *pro se* posttrial claim of ineffective
>
> assistance of counsel, the trial court should first examine the factual basis of the
>
> defendant's claim. If the trial court determines that the claim lacks merit or
>
> pertains only to matters of trial strategy, then the court need not appoint new
>
> counsel and may deny the *pro se* motion. However, if the allegations show
>
> possible neglect of the case, new counsel should be appointed."

¶ 54        A court can conduct an inquiry into allegations counsel was ineffective by doing

one or more of the following: "(1) questioning the trial counsel, (2) questioning the defendant,

and (3) relying on its own knowledge of the defense counsel's performance in the trial." *People*

*v. Peacock*, 359 Ill. App. 3d 326, 339, 833 N.E.2d 396, 407 (2005). "[A] preliminary *Krankel*

inquiry should operate as a neutral and nonadversarial proceeding." *People v. Jolly*, 2014 IL

117142, ¶ 38, 25 N.E.3d 1127. Accordingly, "the State should never be permitted to take an adversarial role against a *pro se* defendant at the preliminary *Krankel* inquiry." *Id.*

¶ 55       "Where a defendant's claims are conclusory, misleading, or legally immaterial, or do not bring to the trial court's attention a colorable claim of ineffective assistance of counsel, the trial court may be excused from further inquiry." *People v. Bobo*, 375 Ill. App. 3d 966, 985, 874 N.E.2d 297, 315 (2007). Whether a trial court properly conducted a *Krankel* inquiry is a matter of law that we review *de novo*. *Jolly*, 2014 IL 117142, ¶ 28.

¶ 56                     2. *Alleged Adversarial Participation of Trial Counsel*

¶ 57       We first address defendant's claim the trial court erred by allowing trial counsel to participate in an adversarial manner. Citing *People v. Jackson*, 2016 IL App (1st) 133741, 50 N.E.3d 66, defendant argues the trial court improperly allowed his trial counsel to participate in an adversarial manner by "straightforwardly arguing to the court that [defendant's] ineffective assistance of counsel claims should be rejected." Defendant further argues that "by ruling on the written submissions alone, the court ensured that its ruling was based in part on the relative drafting skills of a *pro se* litigant pitted against an adversarial attorney."

¶ 58       In *Jackson*, the appellate court stated:

> "At this preliminary stage of the *Krankel* inquiry, '[t]rial counsel may simply
> answer questions and explain the facts and circumstances surrounding the
> defendant's allegations,' but not argue his or her side of the story. [*Moore*, 207 Ill.
> 2d at 78.] The key point, at this preliminary *pro se* stage, where the only question
> is whether defendant has demonstrated possible neglect of the case based on the
> defendant's factual allegations, is that any participation by trial counsel not

- 22 -

become adversarial. See *Jolly*, 2014 IL 117142, ¶ 38." *Jackson*, 2016 IL App (1st) 133741, ¶ 80.

¶ 59        In *Jackson*, the appellate court found the trial court conducted an improper *Krankel* inquiry when it decided the merits of the defendant's ineffective assistance of counsel claim rather than first determining whether defendant's factual allegations showed trial counsel's possible neglect of the case. *Id.* ¶ 77. The *Jackson* court additionally found the court erred by (1) improperly considering evidence beyond the record and (2) misconstruing the appellate court's prior mandate regarding a jury admonition issue. *Id.* ¶¶ 78, 79. *Jackson* did not involve a claim of alleged adversarial participation by the defendant's trial counsel; rather, the defendant's lead trial counsel, who was the subject of several of his ineffective assistance claims, was not present at all for the trial court's preliminary *Krankel* inquiry. *Id.* ¶ 80. The *Jackson* court determined that, because it had already found the trial court improperly decided the merits of the defendant's ineffective assistance claims, "the question of whether trial counsel should have been present is difficult to gauge." *Id.* ¶ 81. The court then recommended, upon remand, the trial court "ensure trial counsel's presence at the preliminary phase of the *Krankel* hearing if necessary to answer any basic factual or foundational questions about the trial proceedings." *Id.*

¶ 60        Based on our review of *Jackson*, we agree with the State that "[t]he *Jackson* court's general statements that any participation by defense counsel in a preliminary *Krankel* inquiry should be nonadversarial are *dicta* based only on the general proposition that such inquiries should be nonadversarial." Also, neither of the cases cited by the *Jackson* court (*Moore*, 207 Ill. 2d at 78; *Jolly*, 2014 IL 117142, ¶ 38) involved the alleged adversarial participation of trial counsel during a preliminary *Krankel* inquiry. *Jackson*, 2016 IL App (1st) 133741, ¶ 80. The *Moore* case did not involve or discuss the issue of trial counsel's alleged adversarial participation

- 23 -

in a *Krankel* inquiry (*Moore*, 207 Ill. 2d at 78-80), while *Jolly* involved adversarial participation by the State, which our supreme court found to be an error requiring remand (*Jolly*, 2014 IL 117142, ¶¶ 38, 46). Defendant cites no authority holding that the alleged adversarial participation by defense counsel during a preliminary *Krankel* inquiry constitutes error or—more significantly—reversible error.

¶ 61        However, our inquiry does not end there. In the absence of precedent specifically addressing what constitutes adversarial participation by trial counsel and whether such participation is allowed, we look to the body of developed case law regarding *Krankel* inquiries. As previously noted, a court can conduct an inquiry into allegations counsel was ineffective by doing one or more of the following: "(1) questioning the trial counsel, (2) questioning the defendant, and (3) relying on its own knowledge of the defense counsel's performance in the trial." *Peacock*, 359 Ill. App. 3d at 339. Moreover, "a preliminary *Krankel* inquiry should operate as a neutral and nonadversarial proceeding." *Jolly*, 2014 IL 117142, ¶ 38. Finally, "[a]t this preliminary stage of the *Krankel* inquiry, '[t]rial counsel may simply answer questions and explain the facts and circumstances surrounding the defendant's allegations,' but not argue his or her side of the story." *Jackson*, 2016 Ill App (1st) 133741, ¶ 80 (quoting *Moore*, 207 Ill. 2d at 78).

¶ 62        In this instance, the procedure employed abandoned basic tenets regarding a *Krankel* inquiry and requires reversal. Here, absent was any questioning of trial counsel or the defendant. Instead, the trial court considered the written response filed by trial counsel and neglected to provide defendant an opportunity to respond, in open court, to trial counsel's written response. We realize the court properly considered defense counsel's performance in the trial. Even so, we find it acutely problematic that at this preliminary stage, the procedure used pitted a

self-represented litigant against his former counsel in a fight that was unfair from its inception. Even more troubling, in her written response, trial counsel went well beyond explaining the facts and circumstances surrounding defendant's allegations. Specifically, as to defendant's ineffective assistance of counsel claims, trial counsel, in the written response, offered argument regarding the ultimate issue of whether defendant's claims constituted, as a matter of law, ineffective assistance of counsel. We find no place for such advocacy by trial counsel in a preliminary *Krankel* inquiry. After all, at this stage, the trial court is simply to determine if the allegations show possible neglect of the case and appoint new counsel in the event possible neglect is shown. *Moore*, 207 Ill. 2d at 78.

¶ 63 Accordingly, we find the trial court's *Krankel* inquiry improper and reverse and remand. On remand, the court shall conduct an inquiry into the allegations counsel was ineffective by doing one or more of the following: "(1) questioning the trial counsel, (2) questioning the defendant, and (3) relying on its own knowledge of the defense counsel's performance in the trial." *Peacock*, 359 Ill. App. 3d at 339. Also important on remand, the "preliminary *Krankel* inquiry should operate as a neutral and nonadversarial proceeding." *Jolly*, 2014 IL 117142, ¶ 38.

¶ 64 Although we reverse in order to provide defendant an appropriate *Krankel* hearing, we offer no opinion on the merits of defendant's claims.

¶ 65 B. Defendant's Other Claim

¶ 66 Given our reversal on the *Krankel* issue, we decline to address defendant's remaining claim which may become moot depending upon the outcome of defendant's *Krankel* hearing.

¶ 67 III. CONCLUSION

¶ 68          For the reasons stated, we reverse the trial court's judgment and remand for

further proceedings.

¶ 69          Reversed and remanded with directions.